Clerk's Office
Filed Date: 12/15/21

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

P & L DEVELOPMENT, LLC,

        Plaintiff,

v.

GERBER PRODUCTS COMPANY,
NESTLÉ S.A., PERRIGO COMPANY PLC, L.
PERRIGO COMPANY, and PBM
NUTRITIONALS, LLC,

        Defendants.

Civil Action No. 1:21-cv-5382

**COMPLAINT**

---

Plaintiff P & L Development, LLC ("PLD"), by and through its undersigned counsel, by way of this Complaint against the defendants, Gerber Products Company ("Gerber"), Nestlé S.A. ("Nestlé"), Perrigo Company PLC ("Perrigo Parent"), L. Perrigo Company ("LPC") and PBM Nutritionals, LLC ("PBM," together with Perrigo Parent and LPC, "Perrigo" and collectively with Gerber and Nestlé, "Defendants") respectfully alleges on knowledge as to itself and its own actions, and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This action arises from PLD's efforts to bring much needed competition to the market for the sale of store-brand ("Store-Brand")[1] infant formula to U.S. retailers[2] ("Retailers").

2.     The market for sale of Store-Brand infant formula to Retailers has been and is currently dominated by a single supplier—Perrigo. In response to Retailer demand for lower prices, better service, and to mitigate supply chain risks, PLD sought to enter that market.

---

[1] "Store-Brand" products are products sold under private label brands managed solely by a retailer for sale in a specific chain of stores.

[2] Retailers include Walmart, Kroger, CVS, Target, Meijer, Rite Aid, and Walgreens to name a few.

3.  To enter the market, PLD entered into a binding contract (the "Contract") with Gerber, a copy of which is attached as Exhibit 1 and incorporated herein by reference, ▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇

4.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

5.  Gerber is not in the business of signing contracts that are not profitable.

6.  Gerber would not have signed the Contract unless it expected to profit from doing so.

7.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

8.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

9.  Instead of living up to its contractual obligations owed to PLD, Gerber has repudiated and breached the Contract ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

10.      Plaintiff PLD brings claims against Defendants under federal and New York State antitrust law, alleging violations of the Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 *et seq.* and seeking damages and injunctive relief to remedy the ongoing anti-competitive effects of the Defendants' unlawful conduct. Plaintiff PLD seeks further redress for Defendant Gerber's breach of contract, and for the co-conspirators' tortious interference with the Contract.

## THE PARTIES

11.      Plaintiff PLD is a leading manufacturer, packager, and distributor of Store-Brand over-the-counter ("OTC") pharmaceuticals and consumer health care products. PLD is a limited liability company formed pursuant to the laws of the state of Delaware, and has its principal place of business in Westbury, New York. PLD suffered antitrust injury as a result of the Defendants' unlawful conduct.

12.      Defendant Gerber is a corporation that manufactures and sells baby food, infant formula, and other child nutritional products. Gerber does not sell Store-Brand infant formula to Retailers. Gerber is incorporated in Michigan, and has its principal place of business in Arlington, Virginia. Gerber is a direct wholly owned subsidiary of Nestlé Holdings, Inc., an indirect wholly owned subsidiary of Nestlé. Gerber is referred to publicly as Nestlé Nutrition North America.

13.      Defendant Nestlé is a corporation that is the largest food and drink processing company in the world, which manufactures and sells food, beverage, and pet care products. Nestlé is headquartered in Vevey, Vaud, Switzerland and has its principal place of business in Switzerland. Nestlé is the indirect parent of Gerber.

- 3 -

14.     Defendant Perrigo Parent is a corporation that manufactures and sells pharmaceutical and personal care products, including Store-Brand infant formula.  Perrigo Parent is incorporated in Ireland, and has its principal place of business in Grand Rapids, Michigan.

15.     Defendant LPC is a corporation that manufactures and sells pharmaceutical and personal care products, including Store-Brand infant formula.  LPC is incorporated in Michigan and has its principal place of business in Allegan, Michigan.  LPC is a direct wholly owned subsidiary of Perrigo Parent.

16.     Defendant PBM is a limited liability company incorporated in Delaware and has its principal place of business in Milton, Vermont.  It manufactures Store-Brand infant formula.  PBM is an indirect wholly owned subsidiary of Perrigo Parent.

## JURISDICTION AND VENUE

17.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The action seeks to recover treble damages, interest, costs of suit, equitable relief, and reasonable attorneys' fees incurred as a result of Defendants' restraints of trade, monopolization, and conspiracy to monopolize the market for the sale of Store-Brand infant formula to Retailers.

18.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1337(a) (antitrust) and 15 U.S.C. § 15 (antitrust).

19.     Venue is appropriate in this district under 15 U.S.C. § 15 (a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision).  Further, pursuant to 28 U.S.C § 1391(c)(3), any Defendant not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in

determining proper venue.  Defendants conduct business, carry out their affairs, and transact interstate trade and commerce, in substantial part, in this district.

20.     The Court has personal jurisdiction over each Defendant.  Each Defendant has conducted business, maintained substantial contacts, and/or committed overt acts in the United States and New York in furtherance of the unlawful conduct and conspiracy alleged herein, and have purposefully availed themselves of the benefits and protections of United States and New York law, such that the exercise of jurisdiction over them would comport with due process requirements.  Defendants' overt acts have been directed at—and have had the intended effect of causing injury to—PLD, which is located in and does business in this district.

## FACTUAL BACKGROUND

### I.     PLD's Beginnings and Growth

21.     PLD is a family-owned and -operated business founded in 1988.  From modest beginnings, PLD has evolved into a trusted Store-Brand over-the-counter ("OTC") industry leader, collaborating with major Retailers nationwide including Walmart, Walgreens, and CVS.

22.     Today, PLD provides the full spectrum of manufacturing, packaging, distribution, and creative solutions for a broad range of high-quality Store-Brand health care products.   Its products include solid and liquid dose OTC analgesics, digestive, cough/cold, allergy, and sleep medication products.  PLD's products also include first aid ointments and related products, personal and feminine care, supplements, electrolytes, and nicotine replacement therapy products.

23.     At any given Retailer, an allergy sufferer may find the following PLD-supplied products for sale under the Retailer's Store-Brand label on the same shelf as well-known national

branded ("Branded")[3] products at a price that is typically 30% less than the comparable Branded products:

| National Brand | PLD Supplied Store-Brand |
|---|---|
|  |   **Walgreens** |
|  |   **Rite Aid** |
|  |   **Amazon** |

---

[3] "Branded" products are products distributed nationally through various retail chains under a brand owned by a manufacturer or distributor.

| National Brand | PLD Supplied Store-Brand |
|---|---|
|  | |

24. Someone suffering from a headache, for example, may find the following PLD supplied products under the Retailer's Store-Brand on the same shelf as the following well-known national brands:

| National Brand | PLD Supplied Store-Brand |
|---|---|
| | **CVS** |
| | **Walmart** |

- 7 -



| National Brand | PLD Supplied Store-Brand |
|---|---|
| | **Target** |
| | **Kroger** |

25.     Companies like PLD and Perrigo compete to supply Retailers with Store-Brand products.  In most cases, each Retailer will select only one supplier for each Store-Brand product.

26.     To effectively serve Retailers and to ensure a reliable, uninterrupted supply to U.S. consumers of Store-Brand alternatives to Branded products, PLD maintains state-of-the-art, current Good Manufacturing Practices-compliant facilities and employs industry best practices. PLD maintains manufacturing, packaging, and distribution facilities in Westbury, New York; Copiague, New York; Miami, Florida; Lynwood, California; Clinton, South Carolina; Piedmont, South Carolina; and Duncan, South Carolina.

27.     Today, Perrigo is the largest supplier of Store-Brand OTC pharmaceutical products in the United States, and is PLD's most direct and primary competitor for the sale of Store-Brand OTC pharmaceutical products to Retailers.

- 8 -

## II.    **Infant Formula Manufacturers**

28.     There are only four manufacturers of infant formula in the United States: (1) Perrigo, (2) non-party Abbott Laboratories ("Abbott"), (3) non-party Mead Johnson & Company LLC ("Mead Johnson"), and (4) Gerber. As noted above, Perrigo is the only manufacturer of Store-Brand infant formula sold to Retailers in the United States. Abbott, Mead Johnson, and Gerber do not sell Store-Brand infant formula to Retailers, but instead sell only infant formula under their own national brands. Those national brands of infant formula are: (1) the Similac®-brand (sold by Abbott), (2) the Enfamil®-brand (sold by Mead Johnson), and (3) Defendant Gerber's Good Start®-brand.

29.     Both Abbott and Mead Johnson lack the capacity to expand their production of infant formula beyond their current levels utilized for their own national brands, and they have no ability to further scale up production to sell infant formula to PLD for resale as Store-Brand infant formula to Retailers.

30.     █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

## III.    **The Relevant Market**

31.     The relevant product market in this case is the sale of Store-Brand infant formula to Retailers and the relevant geographic market is the United States.

32.     The sale of Store-Brand infant formula to Retailers is distinct from and not reasonably interchangeable with the sale of Branded infant formula to Retailers. Manufacturers of Branded infant formula do not sell Store-Brand infant formula to Retailers. As explained above, two of those three manufacturers do not possess the necessary capacity to sell Store-

Brand infant formula to Retailers, ███████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████

33.    Perrigo's Store-Brand infant formula business generates hundreds of millions of dollars annually with high margins generated by its entrenched monopoly position.

34.    Perrigo produces twelve infant formulas for 68 Retailers, which are sold in more than 40,000 retail locations throughout the United States. Perrigo is the only supplier of Store-Brand infant formula for all of these Retailers, which include Walmart, Sam's Club, Target, Kroger, CVS, HEB, Meijer, and Walgreens, to name just a few. Perrigo boasts that "no matter where you shop, our store brand infant formulas are available in grocery, drug, online and club stores." *See* Store Brand Formula.com, Brought to you by Perrigo, *Baby Formula FAQs – Store Brand Formula*, Comment to *Q: What brands does Perrigo make?,* https://www.storebrand formula.com/baby-formula-questions.aspx (last visited Sept. 28, 2021).

35.    As noted above, the three leading manufacturers of Branded infant formula products—Abbott (Similac®-brand), Mead Johnson (Enfamil®-brand), and Gerber (Good Start®-brand)—do not offer Store-Brand infant formula products to Retailers and do not compete with Perrigo in this market.

36.    While Store-Brand infant formula products are manufactured to be the same or equivalent to the Branded products, they are marketed by the manufacturers very differently. The manufacturers of Branded infant formula, for example, compete with each other by spending ██████████████████████ of dollars annually in advertising and marketing to attract new parents to their Branded formulas. ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

37.     Because Perrigo is the only supplier of Store-Brand infant formula to Retailers, Retailers have no choice but to pay the monopoly prices demanded by Perrigo. In addition, because of formula recalls, service issues, inadequate capacity at Perrigo's plants, and other supply chain concerns, Retailers, like Walmart, are interested in finding an alternative to Perrigo to supply their needs for Store-Brand infant formula.

38.     PLD's entry into the Store-Brand infant formula market would bring Retailers much needed competition resulting in lower prices, increased output, and broader supply options to Retailers.

### IV.     PLD and Gerber Execute a Binding Contract for PLD to Sell Store-Brand Infant Formula to Retailers

39.     In late 2019, PLD identified Gerber as a viable business partner to facilitate PLD's entry into the Store-Brand infant formula market. Recognizing that the barriers to enter the market to manufacture and sell new Store-Brand infant formula products to Retailers are high, PLD sought to partner with Gerber. Indeed, during a May 14, 2019 public conference sponsored by Goldman Sachs, Perrigo's CEO described those barriers as creating "significant" and "high moats," noting that "there are only 3 or 4 approved manufacturers in the United States, and it's been 20 years since the FDA approved another." The most significant of these barriers are (1) the cost to construct an infant formula manufacturing plant, which would easily cost tens of millions of dollars and take years to complete, and (2) the expense and time required to conduct clinical trials required under FDA regulations for marketing of new infant formula products.

40.     Pursuant to 21 CFR 106.96, all new infant formula manufacturers are required to conduct lengthy and expensive infant growth monitoring studies for each formula. Such studies cost millions of dollars per study, and take at least 2 years to complete. To attract Retailer interest, entry into the Store-Brand infant formula market requires at least four distinct formulas; thus, accompanying clinical trials cost tens of millions of dollars.

41.     Unlike new manufacturers of infant formula, existing manufacturers are "grandfathered in" and exempt from the requirement to conduct growth monitoring studies for their existing formulas. By partnering with Gerber, which is an existing manufacturer of infant formula, PLD could rapidly enter the relevant product market and sell Store-Brand infant formula to Retailers without the significant expenditures and burden of lengthy clinical trials including infant growth monitoring studies.

42.     PLD believed Gerber would likewise be interested in partnering with PLD. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████     ██████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

43.     ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

44. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

45. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████

46. ███████████████████████████████████
████████████████████████████████████████
████████████████.

47. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████

48. ███████████████████████████████████
████████████   ████████████████████████████
████████████████████████████████████████
████████████████████

49. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

50.     The direction for Gerber to sign the Contract finally came in February 2021.  On February 26, 2021, PLD and Gerber executed a valid, binding, and enforceable contract incorporating the agreed upon key terms.

51.     █████████████████████████████████████████████
███████████                          ███████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████

52.     █████████████████████████████████████████
████████████████████████████████████████████

53.     █████████████████████████████████████████
██████████████████████████████████████████

54.     █████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████

55.     █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████  ██████████████████████████████
████████████████████████████████████

56.     The terms and conditions of PLD's standard Purchase Order form—which governs all purchases and sales made under the Parties' Contract and is attached as Exhibit 2 and incorporated herein by reference—provides additional details concerning time and manner of delivery. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

57.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████     ████████████████████████████

████████████████████████████████████████████████████████

████████████████████     ████████████████████████████

████████████████████████████████████████████████████████

████████████████████     ████████████.

## V.     Perrigo's Anticompetitive Agreement with Gerber and Nestlé

58.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

Only when Gerber breached the Contract did the unlawful and anticompetitive conduct come to light.

59.     Knowing that two of the three other infant formula manufacturers (Abbott and Mead Johnson) lack the capacity to enter the market for the sale of Store-Brand infant formula to Retailers in a meaningful way to effectively challenge Perrigo's monopoly of that market, Perrigo sought to fortify the "moat" that has protected its monopoly for so many years.

60.     Recognizing that Gerber possesses enough excess capacity to supply the entire Store-Brand infant formula market, and that Gerber would not be required to conduct the extremely expensive and time-consuming clinical trials and infant growth monitoring studies required of a new entrant into the Store-Brand infant formula market, Perrigo needed to lock up Gerber's excess capacity to preserve its monopoly.

61.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████  ██████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

## VI.    <u>Gerber Repudiates the Contract</u>

62.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████  ██████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

63.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

64.     ████████████████████████████████████████

█████████████████████████████████████████

65.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

66.     On May 13, 2021, PLD asked Gerber to provide more information about the other deal, including an explanation of how, if at all, Gerber anticipated the other deal might affect the Contract's timeline for bringing Store-Brand infant formula to market under the PLD-Gerber Partnership.

67.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

68.     ████████████████████████████████████████

████████████████ PLD was forced to cancel its meeting with Walmart scheduled for May 13, 2021.

69.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

70. ███████████████████████████████████████████
███████████████████████████████████████ ██
█████████████████████████

71. ███████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████

72. ███████████████████████████████████████████
████████████████████████████████████████ ██
█████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████████

73. ███████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████

74. ███████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████ ████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████

75.     Accordingly, by letter dated September 22, 2021, PLD informed Gerber that its conduct and communications constituted a repudiation and material breach of the Contract. The letter further advised Gerber that PLD considered the repudiation final, PLD's performance under the Contract excused, the Contract terminated, and that PLD would be seeking damages caused by Gerber's breach.

## VII.    Effect on Interstate Commerce

76.     The anticompetitive conduct that caused PLD's injuries, as alleged herein, has had a direct, substantial, and reasonably foreseeable effect on domestic commerce in the United States. This domestic effect gives rise to PLD's Sherman Act claims.

77.     The primary effect of Defendants' anticompetitive conduct has been on domestic commerce. Perrigo manufactures and sells Store-Brand infant formula across state lines in an uninterrupted flow of interstate commerce.

78.     PLD contracted with Gerber to enable PLD to enter the market for the sale of Store-Brand infant formula to Retailers. But as a result of Defendants' unlawful Anticompetitive Agreement, Defendants agreed and conspired to keep PLD out of that market, which has resulted in, and will continue to result in, artificially inflated prices for Store-Brand infant formula.

79.     Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. All Defendants engaged in illegal activities within the flow of—and substantially affecting—interstate commerce, including in this district.

80.     Accordingly, the anticompetitive effects of Defendants' actions have manifested primarily in commerce in the United States, where Retailers and consumers were deprived of

competition in the market, thereby increasing prices, reducing innovation and quality of service, and lowering output.

## VIII. Anticompetitive Conduct and Effects

81. Through Gerber's, Nestlé's, and Perrigo's adherence to the Anticompetitive Agreement, and Gerber's breach of the Contract and other overt acts in New York made pursuant to and in furtherance of that Agreement and conspiracy as alleged above, Defendants engaged in anticompetitive conduct by unlawfully excluding PLD from the market for the sale of Store-Brand infant formula to Retailers.

82. Defendants' anticompetitive conspiracy and conduct has foreclosed competition in the market for the sale of Store-Brand infant formula to Retailers, affected a substantial volume of commerce in the market, and caused anticompetitive harm to PLD, Retailers, and, ultimately, consumers of infant formula.

83. Defendants' conduct foreclosed competition in the market for the sale of Store-Brand infant formula to Retailers by maintaining Perrigo's monopoly position and keeping PLD out of the market. As explained above, but for Defendants' conduct, PLD would have entered the market pursuant to the Contract. Defendants' conduct blocked PLD from entering the market.

84. Defendants' exclusion of PLD from the market has harmed both Retailers and consumers of infant formula.

85. Moreover, by blocking PLD from entering the market, Defendants' conduct preserved Perrigo's monopoly power in the market, thereby creating additional anticompetitive effects. Defendants did not simply eliminate PLD as a competitor; they eliminated PLD as a competitor and preserved monopoly power in the same space.

- 20 -

## IX.   Antitrust Injury

86.    PLD has suffered antitrust injury as a direct result of Defendants' unlawful conduct.  As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, PLD suffered substantial losses to its business or property, including the loss of substantial profits and future profits from selling Store-Brand infant formula to Retailers.

87.    PLD's injuries were foreseeable.  Defendants were aware, or should have been aware, that PLD would be unable to enter the market without Gerber's adherence to the Contract.  Absent Defendants' anticompetitive conduct, PLD could have entered the market, resulting in substantial profits for PLD ▮▮▮▮▮▮▮▮   These activities would have brought additional competition to the market and challenged Perrigo's monopoly in the market and, as a result, decreased prices and cost and increased innovation, quality of service, and output in the market. PLD was injured in a manner that the antitrust laws were intended to prevent.

## COUNT ONE:  Sherman Act § 1
### (Unreasonable Restraints of Trade)
### (Against All Defendants)

88.    PLD repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

89.    Defendants have engaged, and continue to engage, in an unlawful contract, combination or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

90.    The unlawful contract, combination or conspiracy consisted of Perrigo, Nestlé, and Gerber entering into the Anticompetitive Agreement and adhering to that Agreement to assist Perrigo in willfully and wrongfully maintaining monopoly power in the relevant market and to keep PLD out of that market.   The Anticompetitive Agreement achieved its

anticompetitive purpose and unreasonably restrained trade.

91.     The sale of Store-Brand infant formula to Retailers is the relevant product market, and the United States is the relevant geographic market.

92.     As the only supplier of Store-Brand infant formula in the United States, the Anticompetitive Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

93.     The purpose and effect of the Anticompetitive Agreement is to maintain Perrigo's market power by keeping competitors out of the market and enable Perrigo to make supra-competitive profits and to raise and maintain the prices that Retailers and consumers have to pay for Store-Brand infant formula. ████████████████████████████████████

████████████████████

94.     In furtherance of the Defendants' preexisting conspiracy to keep new entrants out of the relevant market, ████████████████████████████████████

████████████████████████████████████████████

95.     To the extent Defendants are permitted to assert one, there is no and never was any legitimate, non-pretextual, pro-competitive justification for this anticompetitive restraint. Even if there was some conceivable and cognizable justification, the Anticompetitive Agreement was unnecessary to achieve such a purpose, and the restraint's anticompetitive effect on consumers, PLD and competition outweighed any such pro-competitive justification.

96.     Defendants, through the Anticompetitive Agreement, have harmed consumers and competition by, without limitation, depriving Retailers and consumers of lower prices and increased innovation, quality of service, and output in the market, which healthy and fair competition would have provided.

- 22 -

97.     As a direct, foreseeable, and proximate result of Defendants' exclusionary and anticompetitive conduct, PLD has suffered damages, in an amount to be proven at trial.  PLD suffered substantial losses to its business or property, including the loss of substantial profits and future profits from selling Store-Brand infant formula to Retailers.  The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Unless PLD obtains equitable relief, Defendants' violation will continue to injure PLD's business and property.  PLD's injury consists of its exclusion from the market, which is the type of injury the antitrust laws were designed to prevent.  This injury flows from Defendants' unlawful conduct.

## COUNT TWO:  Sherman Act § 2
### (Unlawful Maintenance of Monopoly)
### (Against Perrigo)

98.     PLD repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

99.     The sale of Store-Brand infant formula to Retailers is the relevant product market and the United States is the relevant geographic market.

100.    Perrigo violated 15 U.S.C. § 2 by unlawfully maintaining its monopoly in the market for selling Store-Brand infant formula to Retailers in the United States.

101.    At all relevant times, Perrigo possessed monopoly power in the relevant market. Perrigo possessed and continues to possess the power to control prices and exclude competition in the relevant market, to prevent prices from falling in the relevant market, and, through the Anticompetitive Agreement with Gerber and Nestlé, to exclude competitors like PLD from the relevant market.

102.    That monopoly is coupled with high barriers to entry into the market as alleged

- 23 -

herein.

103.    Perrigo willfully and wrongfully obtained and maintained monopoly power by using restrictive or exclusionary conduct, rather than using greater business acumen.  This conduct injured PLD.

104.    Perrigo's conscious objective is to further its dominance through exclusionary conduct.

105.    As alleged herein, Perrigo knowingly, willfully, and wrongfully maintained monopoly power and harmed competition by entering into and abiding by the Anticompetitive Agreement.

106.    Perrigo's anticompetitive conduct is exclusionary, the purpose and effect of which is to willfully maintain monopoly power, which harms consumers, competition, and competitors like PLD, in violation of Section 2 of the Sherman Act.

107.    To the extent Perrigo is permitted to assert one, there is and was no cognizable, non-pretextual pro-competitive justification for their exclusionary conduct that outweighs its harmful effects.  Even if there were some conceivable justification that Perrigo were permitted to assert, its conduct is and was broader than necessary to achieve such a purpose.

108.    PLD has been harmed by Perrigo's anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  But for Defendants' Anticompetitive Agreement to keep PLD out of the market, PLD would have challenged Perrigo as a competitor in the market. Perrigo's conduct has deprived Retailers and consumers of lower prices, increased innovation, better quality of service, and higher output in the market.

109.    As a direct and proximate result of Perrigo's continuing exclusionary, anticompetitive conduct, PLD has suffered damages, in an amount to be proven at trial.  PLD

suffered substantial losses to its business or property, including the loss of substantial profits and future profits from selling Store-Brand infant formula to Retailers. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Unless PLD obtains equitable relief, Perrigo's violation will continue to injure PLD's business and property. PLD's injury consists of its exclusion from the market, which is the type of injury the antitrust laws were designed to prevent. This injury flows from Defendants' unlawful conduct.

**COUNT THREE:  Sherman Act § 2**
**(Conspiracy to Monopolize)**
**(Against All Defendants)**

110.    PLD repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

111.    The sale of Store-Brand infant formula to Retailers is the relevant product market and the United States is the relevant geographic market.

112.    At all relevant times, Perrigo possessed monopoly power in the relevant market.

113.    That monopoly is coupled with high barriers to entry into the market as alleged herein.

114.    Perrigo willfully and wrongfully obtained and/or maintained its monopoly in the Store-Brand infant formula market by engaging with Gerber and Nestlé in the exclusionary, anticompetitive conduct set forth herein.

115.    The anticompetitive effects of Defendants' conduct far outweigh any purported procompetitive justifications.

116.    Defendants entered into a conspiracy to monopolize the sale of Store-Brand infant formula to Retailers. Defendants acted with specific intent to achieve and confer the benefits of

this unlawful monopoly upon each other by engaging in multiple overt acts in furtherance of their conspiracy as detailed above.

117.    The Defendants further conspired and acted in concert to exclude PLD from the market for the sale of Store-Brand infant formula to Retailers, in furtherance of their preexisting conspiracy to enforce their Anticompetitive Agreement to keep any and all new entrants out of the relevant market. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

118.    As a direct, foreseeable, and proximate result of Defendants' exclusionary and anticompetitive conduct, PLD has suffered damages, in an amount to be proven at trial. PLD suffered substantial losses to its business or property, including the loss of substantial profits and future profits from selling Store-Brand infant formula to Retailers. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Unless PLD obtains equitable relief, Defendants' violation will continue to injure PLD's business and property. PLD's injury consists of its exclusion from the market, which is the type of injury the antitrust laws were designed to prevent. This injury flows from Defendants' unlawful conduct.

## COUNT FOUR
### (New York General Business Law § 340)
### (Unlawful Maintenance of Monopoly)
### (Against Perrigo)

119.    PLD repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

120. In addition to violating federal antitrust laws, Defendants' unlawful and anticompetitive conduct also violates New York Antitrust law, the Donnelly Act, New York Gen. Bus. Law § 340.

121. The sale of Store-Brand infant formula to Retailers is the relevant product market and the United States, including New York, is the relevant geographic market.

122. Defendants individually and/or collectively have substantial market power with respect to the sale of Store-Brand infant formula to Retailers in the United States.

123. Perrigo violated the Donnelly Act through its monopoly power in the market for selling Store-Brand infant formula to Retailers in the United States. Perrigo possesses the power to control prices and exclude competition in the relevant market, to prevent prices from falling in the relevant market, and, through the Anticompetitive Agreement with Gerber and Nestlé, to exclude competitors like PLD from the relevant market.

124. That monopoly is coupled with high barriers to entry into the market as alleged herein.

125. Perrigo willfully and wrongfully obtained and maintained monopoly power by using restrictive or exclusionary conduct, rather than using greater business acumen. This conduct injured PLD.

126. Perrigo's conscious objective is to further its dominance through exclusionary conduct.

127. As alleged herein, Perrigo knowingly, willfully, and wrongfully maintained monopoly power and harmed competition by entering into and abiding by the Anticompetitive Agreement.

128.    To the extent Perrigo is permitted to assert one, there is and was no cognizable, non-pretextual pro-competitive justification for their exclusionary conduct that outweighs its harmful effects.  Even if there were some conceivable justification that Perrigo were permitted to assert, its conduct is and was broader than necessary to achieve such a purpose.

129.    As a competitor of Perrigo, PLD has been harmed by Perrigo's anticompetitive conduct in a manner that the Donnelly Act is intended to prevent.  But for Defendants' Anticompetitive Agreement to keep PLD out of the market, PLD would have challenged Perrigo as a competitor in the market.  Perrigo's conduct has deprived Retailers and consumers of lower prices, increased innovation, better quality of service, and higher output in the market.

130.    As a direct and proximate result of Perrigo's continuing exclusionary, anticompetitive conduct in violation of the Donnelly Act, PLD has suffered damages, in an amount to be proven at trial.  PLD suffered substantial losses to its business or property, including the loss of substantial profits and future profits from selling Store-Brand infant formula to Retailers.  The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.  Unless PLD obtains equitable relief, Perrigo's violation will continue to injure PLD's business and property.  PLD's injury consists of its exclusion from the market, which is the type of injury the Donnelly Act was designed to prevent.  This injury flows from Defendants' unlawful conduct.

**COUNT FIVE**
**(New York General Business Law § 340)**
**(Unreasonable Restraint of Trade)**
**(Against All Defendants)**

131.    PLD repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

132.    Perrigo, Nestlé, and Gerber are also violating the Donnelly Act by entering into agreements for the purpose of unreasonably restraining trade by way of their Anticompetitive Agreement and adherence to that agreement, to assist Perrigo in willfully and wrongfully maintaining monopoly power in the market for sale of Store-Brand infant formula to Retailers in the United States, and to keep PLD out of that market in furtherance of the Anticompetitive Agreement. The Anticompetitive Agreement achieved the purpose for which it was undertaken and unreasonably restrained trade.

133.    The purpose and effect of the Anticompetitive Agreement is to keep competitors out of the market to enable Perrigo to make supra-competitive profits and to raise and maintain the prices that Retailers and consumers pay for Store-Brand infant formula.

134.    In furtherance of the Defendants' preexisting conspiracy to keep new entrants out of the market for the sale of Store-Brand infant formula to Retailers, █████████████████

█████████████████████████████████████████████

███████████████████████

135.    To the extent Defendants are permitted to assert one, there is and was no legitimate, non-pretextual, pro-competitive justification for this anticompetitive restraint. Even if there was some conceivable and cognizable justification, the Anticompetitive Agreement was unnecessary to achieve such a purpose, and the restraint's anticompetitive effects on consumers, PLD and competition outweighed any such pro-competitive effects.

136.    Defendants, through the Anticompetitive Agreement, have harmed consumers and competition by, without limitation, depriving Retailers and consumers of lower prices and increased innovation, quality of service, and output in the market, which healthy and fair competition would have provided.

137.   As a direct, foreseeable, and proximate result of Defendants' exclusionary and anticompetitive conduct, PLD has suffered damages, in an amount to be proven at trial. PLD suffered substantial losses to its business or property, including the loss of substantial profits and future profits from selling Store-Brand infant formula to Retailers. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Unless PLD obtains equitable relief, Defendants' violation will continue to injure PLD's business and property. PLD's injury consists of its exclusion from the market, which is the type of injury the Donnelly Act was designed to prevent. This injury flows from Defendants' unlawful conduct.

**COUNT SIX**
**(New York General Business Law § 340)**
**(Conspiracy to Monopolize)**
**(Against All Defendants)**

138.   PLD repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

139.   The sale of Store-Brand infant formula to Retailers is a relevant product market and the United States is the relevant geographic market.

140.   Perrigo possesses monopoly power in the market for selling Store-Brand infant formula to Retailers in the United States.

141.   That monopoly is coupled with high barriers to entry into the market as alleged herein.

142.   Perrigo willfully and wrongfully obtained and/or maintained its monopoly in the Store-Brand infant formula market by engaging with Gerber and Nestlé in the exclusionary, anticompetitive conduct set forth herein.

143.    The anticompetitive effects of Defendants' conduct far outweigh any purported procompetitive justifications.

144.    Defendants entered into a conspiracy to monopolize the sale of Store-Brand infant formula to Retailers. Defendants acted with specific intent to achieve and confer this unlawful monopoly upon each other by engaging in multiple overt acts in furtherance of their conspiracy as detailed above.

145.    The Defendants further conspired and acted in concert to exclude PLD from the market for the sale of Store-Brand infant formula to Retailers, in furtherance of their preexisting conspiracy to enforce their Anticompetitive Agreement to keep any and all new entrants out of the relevant market. ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

146.    As a direct, foreseeable, and proximate result of Defendants' exclusionary and anticompetitive conduct, PLD has suffered damages, in an amount to be proven at trial. PLD suffered substantial losses to its business or property, including the loss of substantial profits and future profits from selling Store-Brand infant formula to Retailers. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Unless PLD obtains equitable relief, Defendants' violation will continue to injure PLD's business and property. PLD's injury consists of its exclusion from the market, which is the type of injury the Donnelly Act was designed to prevent. This injury flows from Defendants' unlawful conduct.

## COUNT SEVEN
### (Breach of Contract)
### (Against Gerber)

147.    PLD repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

148.    On February 26, 2021, PLD and Gerber entered into a valid, binding, and enforceable Contract.

149.    ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

150.    On May 25, 2021, and multiple times thereafter, Gerber unequivocally repudiated the Contract by declaring that it was not an enforceable, binding contract, and by refusing to provide PLD with any assurances that it intends to perform under the Contract.

151.    On September 22, 2021, PLD informed Gerber that PLD considered the repudiation to be, and was treating it as, a final, complete, and material breach that terminated the Contract.

152.    PLD had performed all of its obligations under the Contract prior to Gerber's repudiation.  Furthermore, PLD's future performance under the Contract is excused due to Gerber's repudiation and material breach.

153.    All of PLD's lost profit related to its entry (or inability to enter) the market for Store-Brand infant formula is the natural and probable consequence of Gerber's breach, and was contemplated by the Parties at the time the Contract was executed.

154.    Gerber's breach of the Contract has directly and proximately damaged PLD in an amount to be determined at trial.

## COUNT EIGHT
### (Tortious Inference with Contract)
### (Against Nestlé and Perrigo)

155.    PLD repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

156.    The Contract between Gerber and PLD is binding.

157.    Nestlé had knowledge of the Contract by virtue of its position as Gerber's ultimate parent.

158.    Perrigo had knowledge of the Contract because Gerber's compliance with the Contract would breach the Anticompetitive Agreement and disrupt Perrigo's monopoly.

159.    As alleged herein, ███████████████████████

███████████

160.    Nestlé and Perrigo intentionally procured the breach of the Contract by Gerber without any reasonable justification or excuse.

161.    Nestlé was not acting in good faith in its capacity as Gerber's parent, but rather procured the breach to continue to reap the benefits of Defendants' anticompetitive conduct, which would inure to its benefit, without having to comply with the Contract.

162.    Perrigo was not acting in good faith or in its own economic interest as PLD's competitor, but rather procured the breach to continue to maintain its anticompetitive monopoly.

163.    Gerber's breach would not have occurred but for Nestlé's and Perrigo's conduct.

164.    PLD has been damaged by Gerber's breach of the Contract, which was caused by Nestlé and Perrigo.

165.    PLD is therefore entitled to judgment against Nestlé and Perrigo in the amount of the damages incurred by PLD as a result of Gerber's breach in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

(a)    Judgment that Defendants' conduct violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

(b)    Judgment that Defendants' conduct violates New York General Business Law § 340;

(c)    Award PLD damages (including, without limitation, lost profits and future profits), trebled pursuant to 15 U.S.C. § 15(a), together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, in an amount to be determined at trial;

(d)    Grant permanent injunctive relief pursuant to Section 16 of the Clayton Act to remedy the ongoing anticompetitive effects of Defendants' unlawful conduct, including enjoining the enforcement of the Anticompetitive Agreement and Perrigo's "first right" to Gerber's excess capacity;

(e)    Judgment that the Defendant Gerber breached the Contract;

(f)    Judgment that Defendants Nestlé and Perrigo tortiously interfered with the Contract;

(g)    Award PLD damages resulting from  Defendants' breach of and tortious interference with the Contract, in an amount to be determined at trial, including but not limited to PLD's lost profits and other compensatory damages to place

PLD in the position that it would have been in had the Defendant Gerber performed under the Contract;

(h)    Award PLD any consequential damages that are a result of Defendant Gerber's breach of the Contract;

(i)    Award PLD punitive damages resulting from Defendants Nestlé's and Perrigo's tortious interference with the Contract;

(j)    Award PLD pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law on the total amount awarded;

(k)    Grant such other and further relief as the Court deems just and proper.

## TRIAL BY JURY DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, PLD demands a trial by jury as to all matters so triable.

Dated:  New York, New York
        September 28, 2021

**LOWENSTEIN SANDLER LLP**

*/s/ Jennifer Fiorica Delgado*
Jennifer Fiorica Delgado
Meg Slachetka
Christopher M. Schafbuch

1251 Avenue of the Americas, 17th Floor
New York, NY 10020
T: (212) 262-6700
F: (212) 262-7402

jdelgado@lowenstein.com
mslachetka@lowenstein.com
cschafbuch@lowenstein.com

Jonathan L. Lewis (*pro hac vice* eligible)
Zarema A. Jaramillo (*pro hac vice* eligible)

2200 Pennsylvania Avenue, N.W., 5th Floor
Washington, D.C. 20037
T: (202) 753-3800
F: (202) 753-3838

jlewis@lowenstein.com
zjaramillo@lowenstein.com

*Counsel for Plaintiff*
*P & L Development, LLC*

# EXHIBIT 1











# EXHIBIT 2



## CONDITIONS

1. Seller shall acknowledge receipt and acceptance of this order immediately on receipt.

2. Seller's failure to acknowledge receipt of this order with a definite shipping schedule shall be, at Buyer's option, sufficient cause for Buyer's cancellation of this order without Buyer incurring any costs, expenses, damages, or the like.

3. All goods shipped are subject to the approval of Buyer's Inspection Department. If any of the goods are defective in material or workmanship, or otherwise not in conformity with the specifications and/or approved samples and/or other requirements of this order (in any such case "Defective"), the Buyer shall have the option to (i) reject the Defective goods and cancel this order, or (ii) require that such defects or non conformity be corrected at Seller's cost and expense, or (iii) require Seller to promptly replace the Defective goods. In any event, Buyer may charge Seller with the costs, expenses or damages (including but not limited to material, labor, and overhead costs, expenses and damages) occasioned to the Buyer as a consequence thereof. Seller expressly warrants all goods covered by this order shall be strictly in accordance with this order and the specifications therefore, and free from defects, including latent defects. Such warranty shall survive delivery, and shall not be deemed waived either by reason of inspection and/or acceptance of said goods or by the payment therefore by Buyer. In the event that Buyer is compelled to use goods that do not comply with Buyer's specifications, Seller shall pay the expenses, losses, and damages suffered or incurred by Buyer by reason thereof.

4. In accepting this order the Seller agrees to assume responsibility for any losses Buyer incurs in consequence of Buyer's reliance on any untrue or misleading statement made by the Seller with respect to the goods herein ordered.

5. Buyer shall not be charged a price higher than last quoted or charged for the goods covered by this order unless specifically approved in writing by the Buyer.

6. Seller shall protect, defend, hold harmless and indemnify Buyer, including its officers, directors, employees and agents, from and against any and all lawsuits, claims, demands, actions, liabilities, losses, damages, costs and expenses (including attorneys' fees and court costs), regardless of the cause or alleged cause thereof, and regardless of whether such matters are groundless, fraudulent or false, arising out of any actual or alleged (i) misappropriation or infringement of any patent, trademark, trade dress, trade secret, copyright or other right relating to any goods which are the subject of this order; (ii) death or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged use of or latent or patent defect in, such goods, including but not limited to (z) any actual or alleged failure to provide adequate warnings, labelings or instructions, or (y) any actual or alleged failure of said goods to comply with specifications or with any express or implied warranties of Seller; (iii) violation of any law, statute, ordinance, governmental administrative order, rule or regulation relating to the goods, or to any of its components or ingredients, or to its manufacture, shipment, labeling, use or sale; and (iv) act, activity or omission of Seller or any of its employees, representatives or agents, in connection with any sale to or service for the Buyer. Seller shall promptly notify Buyer of the assertion, filing or service of any lawsuit, claim, demand, action, liability or other matter that is or may be covered by this indemnity, and shall immediately take such action as may be necessary or appropriate to protect the interests of Buyer, its officers, directors, employees and agents. Buyer shall at all times have the right to direct the defense of, and to accept or reject any offer to compromise or settle, any lawsuit, claim, demand or liability asserted against Buyer or any of its officers, directors, employees or agents. The duties and obligations of Seller created hereby shall not be affected or limited in any way by Buyer's extension of express or implied warranties to its customers.

7. Transportation charges covering any Defective goods returned to Seller, and the return or replacement of Defective goods shall be at Sellers expense, and Seller shall bear the risk of loss, theft or damage during transportation.

8. The date or dates of delivery herein specified on the part of the Seller to be performed are of the essence and must be strictly adhered to. Seller shall indemnify and save Buyer harmless from any loss, penalty, payment and liability or damage resulting from Seller's inability, refusal or failure to make delivery as specified. If Seller for any reason does not comply with Buyer's delivery schedule, or if Seller is otherwise in default in this or any other order placed by Buyer hereunder, Buyer in addition to any other rights it may have, shall have the option to (i) approve a revised delivery schedule, or (ii) terminate the order without liability to Seller on account thereof. Buyer reserves the right to return for full credit merchandise that is shipped later than 5 days of promised shipment.

9. All goods are to be shipped by Seller in accordance to the Incoterms specified in the header of the Purchase Order. In the event the Buyer requests the Seller to express or air ship any goods (and express or air ship is not the method of delivery specified in the header of the Purchase Order), it is expressly understood and agreed that the Buyer shall be responsible for the difference in cost between the air freight and the cost of method of delivery specified in the header of the Purchase Order.

10. Any unfilled portion of this order may be cancelled by Buyer without liability in the event of petition in bankruptcy being filed by or against Seller, or in the event of appointment of any Receiver of the Seller or the property of Seller, or the Seller is insolvent, or makes an assignment for the benefit of the creditors, or ceases to conduct it's operations in it's normal course of business.

11. Buyer reserves the right to suspend shipments of the goods covered by this order in the event of strkes, floods, fire, casualties, Acts of God, or other contingencies beyond control of the Buyer.

12. A packing list bearing Seller's name and address and all other pertinent information shall be placed in each container. No charge will be allowed for packing, boxing, and cartage. Damage to goods not packed to insure proper protection to same, if accepted by Buyer, will be charged to Seller.

13. All pallets shall be constructed of (i) metal, (ii) plastic, or (iii) wood, provided however, any wood constructed pallet shall be heat treated



## CONDITIONS

and certified free of phenol based fungicide. If any pallet is not constructed of (i) metal, (ii) plastic or (iii) if any wood pallet is not heat treated and certified free of phenol based fungicide then Seller shall pay to Buyer a $150 non compliance charge for each non complying pallet.

14. For the term of this Purchase Order and for a period of three (3) years thereafter, Seller shall carry adequate insurance, with insurance companies that carry an A.M. Best's Rating of "A X" or better, to provide for coverage of its obligations hereunder, the limits for which shall be no less than the following:

    (a) Comprehensive general liability insurance with a combined limit of $5,000,000 per occurrence for bodily injury and property damage which can be made up of primary and specifically coinciding excess liability policies. This policy shall also include contractual liability coverage covering the terms of this Agreement; and

    (b) Products liability insurance (including but not limited to all products, goods and ingredients used in the products/goods purchased by the Buyer) with a combined limit of $10,000,000 per occurrence for bodily injury and property damage which can be made up of primary and specifically coinciding excess liability policies. This policy shall also include contractual liability coverage covering the terms of this Agreement; and

    (c) Auto Liability insurance of at least $1,000,000 combined single limit for at least Hired and Non Owned coverages; and

    (d) Workers Compensation of at least State Statutory Limits in the state of employment; and

    (e) Product Recall insurance covering all expenses and costs of any recall that may occur; and

    (f) The policies of insurance taken by Seller shall have P L Development, LLC d/b/a PL Developments, its subsidiaries, affiliates and divisions as an "additional insured" on a primary and non contributory basis, and, Seller shall provide Buyer with a certificate of insurance, which provides that Buyer as the additional insured, shall be notified, in writing, by the insurance carrier of any termination, not less than thirty (30) days prior to the effective date of any material change, cancellation or non-renewal of the policy. The provisions of this 14 shall survive the expiration or earlier termination of this Purchase Order

15. No modification to this order will be binding on the Buyer unless made in writing by the Buyer.

16. This order is to be construed according to the laws of the State of New York, and all questions of performance and breach are governed by the laws of the State of New York. The rights and remedies herein reserved by the Buyer shall be cumulative and additional to any other or further rights and remedies provided in law or equity. No waiver of any provision of this order in any given instance shall constitute a waiver at such provision in any other instance. No waiver of any provision or breach of this order shall constitute a waiver of any other provision thereof or any other breach thereof. In addition to other remedies provided by law, the Buyer shall have the right to terminate this order at any time after any breath of any of the terms and conditions of this order thereof by Seller.

17. Shipments are to be made via routing and carriers specified by Buyer. No deviation is to be made unless instructed by Buyer.

18. Seller shall consolidate Shipments to greatest possible extent consistent with scheduling instructions of Buyer.

19. In those instances where the Buyer specifically assumes risk of loss upon goods leaving Sellers destination, no single shipment shall be made in excess of $250,000 to the Buyer.