UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| P & L DEVELOPMENT, LLC, | |
| Plaintiffs | Civil Action No. 21-5382 |
| v. | |
| GERBER PRODUCTS COMPANY, NESTLÉ S.A., PERRIGO COMPANY PLC, L. PERRIGO COMPANY, AND PBM NUTRITIONALS, LLC, | |
| Defendants. | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF GERBER'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

    A.    The Infant Formula Market.............................................................................3

    B.    PLD's Attempt to Begin Selling Store-Brand Infant Formula ........................4

    C.    The MOU ..........................................................................................................4

    D.    PLD Fails To Enter the Infant Formula Market...............................................5

LEGAL STANDARD ..........................................................................................................5

ARGUMENT ......................................................................................................................6

I.       PLD'S ANTITRUST CLAIMS SHOULD BE DISMISSED............................................6

    A.    PLD Does Not Plausibly Allege The Required Element of "Antitrust
           Injury".............................................................................................................6

    B.    PLD Does Not Adequately Allege The Existence of a "Relevant Market" ...........8

    C.    PLD'S Section 1 Claim Fails Because PLD Has Not Pled an Unreasonable
           Restraint of Trade ..........................................................................................13

    D.    PLD's Conspiracy to Monopolize Claim Should Be Dismissed Because
           PLD Has Not Alleged Specific Intent to Monopolize .........................................17

    E.    PLD's State Antitrust Claims Should be Dismissed for the Same Reasons
           PLD's Federal Antitrust Claims Fail ................................................................18

II.     THE MOU IS NOT A BINDING SUPPLY AGREEMENT ...........................................19

    A.    There is No Intent To Be Bound.....................................................................20

    B.    The MOU is Not a Typical Supply Agreement and Lacks Critical Terms............21

    C.    The MOU is an Agreement to "Use Commerically Reasonable Efforts to
           Negotiate" Only ..............................................................................................22

CONCLUSION ...................................................................................................................23

4865-9433-7289v.5

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*,
  145 F.3d 543 (2d Cir. 1998).............................................................................. 21, 22

*In re Aluminum Warehousing Antitrust Litig.*,
  95 F. Supp. 3d 419 (S.D.N.Y. 2015).....................................................................14

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  361 F. Supp. 3d 324 (E.D.N.Y. 2019) ...................................................................9

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)...................................................................................15

*Anheuser-Busch, Inc. v. Abrams*,
  520 N.E.2d 535 (N.Y. 1988)...................................................................................19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................5

*Benjamin of Forest Hills Realty, Inc. v. Austin Sheppard Realty, Inc.*,
  34 A.D.3d 91 (N.Y. 2d Dept. 2006).........................................................................6

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979).....................................................................................6

*Bill's Birds Inc. v. Trademarketing Res. Inc.*,
  920 F. Supp. 2d 357 (E.D.N.Y. 2013) .............................................................9, 14

*Biocad JSC v. F. Hoffmann-La Roche*,
  942 F.3d 88 (2d Cir. 2019)......................................................................................19

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962).................................................................................................12

*Brown v. Cara*,
  420 F.3d 148 (2d Cir. 2005)....................................................................................21

*Capital Imaging v. Mohawk Valley Med. Assoc.*,
  996 F.2d 537 (2d Cir. 1993)......................................................................................6

ii

*Chapman v. New York State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008)................................................................................2, 10, 13

*City of New York v. Grp. Health Inc.*,
649 F.3d 151 (2d Cir. 2011)................................................................................8

*Com. Data Servers, Inc. v. Int'l Bus. Machines Corp.*,
262 F. Supp. 2d 50 (S.D.N.Y. 2003)................................................................9

*Concord Assocs., L.P. v. Ent. Properties Tr.*,
817 F.3d 46 (2d Cir. 2016)................................................................................8, 9

*Daniel v. Am. Bd. of Emergency Med.*,
428 F.3d 408 (2d Cir. 2005)................................................................................6

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
732 F.2d 480 (5th Cir. 1984) ................................................................................10

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
472 F.3d 23 (2d Cir. 2006)................................................................................15

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009), *aff'd sub nom. Am. Banana Co.
v. J. Bonafede Co.*, 407 F. App'x 520 (2d Cir. 2010) ........................................ 10, 11

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013)................................................................................6, 19

*George Haug Co. v. Rolls Royce Motor Cars Inc.*,
148 F.3d 136 (2d Cir. 1998)................................................................................6

*Harris v. Mills*,
572 F.3d 66 (2d Cir. 2009)................................................................................5

*Kosher Provisions, Inc. v. Blue & White Food Prod. Corp.*,
No. CV-04-361 (NGG)(SAC), 2005 WL 1890039 (E.D.N.Y. Aug. 9, 2005)........................20

*Liggett & Myers, Inc. v. FTC*,
567 F.2d 1273 (4th Cir. 1977) ................................................................................12

*LPD New York, LLC v. Adidas Am., Inc.*,
No. 15CV6360MKBRLM, 2017 WL 1162181 (E.D.N.Y. Mar. 27, 2017)............................20

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)................................................................................16

*Mathias v. Daily News, L.P.*,
152 F. Supp. 2d 465 (S.D.N.Y. 2001)................................................................8

iii

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)......................................................................................15

*Mooney v. AXA Advisors, L.L.C.*,
  19 F. Supp. 3d 486 (S.D.N.Y. 2014)..........................................................14, 17

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
  889 F.2d 524 (4th Cir. 1989) ......................................................................12

*N. Am. Energy Sys., LLC v. New England Energy Mgmt., Inc.*,
  269 F. Supp. 2d 12 (D. Conn. 2002)..............................................................7

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
  296 F. Supp. 3d 442 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018)..........8, 14

*National Basketball Association v. Williams*,
  857 F. Supp. 1069 (S.D.N.Y. 1994)............................................................14

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  968 F. Supp. 2d 367 (D. Mass. 2013) ........................................................12

*Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*,
  614 F.2d 832 (2d Cir. 1980)........................................................................11

*Nirvana, Inc. v. Nestle Waters N. Am. Inc.*,
  123 F. Supp. 3d 357 (N.D.N.Y. 2015)........................................................11

*Ohio Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
  585 F.2d 821 (7th Cir. 1978)......................................................................14

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007)..........................................................................6

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*,
  812 F. Supp. 387 (S.D.N.Y. 1993) ..............................................................10

*Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc.*,
  No. 17-CV-882 (RA) (KHP), 2020 WL 9214290 (S.D.N.Y. Nov. 4, 2020)..........22

*Santana Prod., Inc. v. Sylvester & Assocs., Ltd.*,
  121 F. Supp. 2d 729 (E.D.N.Y. 1999) ..................................................3, 17, 18

*Satellite Financial Planning Corp. v. First Nat. Bank of Wilmington*,
  633 F. Supp. 386 (D. Del. 1986)................................................................14

*In re Super Premium Ice Cream Distribution Antitrust Litig.*,
  691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v.
  Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990)..........12

iv

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..................................................................................10

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998)...................................................................................16

*Tri-Cnty. Motors, Inc. v. Am. Suzuki Motor Corp.*,
    494 F. Supp. 2d 161 (E.D.N.Y. 2007), *aff'd*, 301 F. App'x 11 (2d Cir. 2008)......................19

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    512 F.2d 1264 (9th Cir. 1975) ............................................................................13

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)................................................................................13

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)...........................................................................................13

*United States v. Joseph Schlitz Brewing Co.*,
    253 F. Supp. 129 (N.D. Cal.), *aff'd sub nom. Jos Schlitz Brewing Co v. U S*,
    385 U.S. 37 (1966).............................................................................................12

*Volmar Distributors, Inc. v. New York Post Co.*,
    825 F. Supp. 1153 (S.D.N.Y. 1993).......................................................................7

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)...................................................................17

**Statutes**

N.Y. Gen. Bus. Law § 340............................................................................................5, 18, 19

Sherman Act § 1 ........................................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)................................................................................................ *passim*

4865-9433-7289v.5

Defendant Gerber Products Co. ("Gerber") submits this memorandum of law in support of its motion to dismiss the Complaint filed by P & L Development, LLC ("PLD") pursuant to Fed. R. Civ. P. 12(b)(6).[1]

## PRELIMINARY STATEMENT

Plaintiff PLD wished to purchase infant formula from Gerber and, in turn, market and resell that formula to retailers as a store-brand product. In the early stages of that effort, PLD entered into a Memorandum of Understanding ("MOU") with Gerber to negotiate the terms for purchasing some of Gerber's excess supply of formula. As its title suggests, the MOU was a preliminary summary that contemplated the future execution of a more detailed, binding supply agreement that is unenforceable against either party. According to PLD, at the time that the MOU was executed, Gerber was already a party to a supply agreement with one of the Perrigo defendants ("Perrigo") that gave Perrigo a right of first refusal to purchase all of Gerber's excess supply of infant formula if Perrigo elected to do so. PLD alleges that Gerber breached the MOU in order to comply with the pre-existing supply contract with Perrigo.

Disappointed that a supply contract with Gerber never came to fruition, PLD now seeks to bring a wide assortment of claims against five defendants—eight causes of action sounding in restraint of trade, monopoly, conspiracy, breach of contract, and tortious interference with contract. All of these claims should be dismissed. Both Gerber and Perrigo sought nothing more than to comply with a valid and lawful pre-existing supply contract. There was nothing wrong with doing so. Supply contracts of the sort that PLD seeks to challenge are normal and commonplace in commercial business arrangements that serve legitimate purposes. PLD cannot challenge their

---

[1] As of the time of filing, Nestlé S.A. has not been served. Per the parties' stipulation (ECF No. 10), adopted by the Court, Nestlé S.A.'s "responsive pleading or Rule 12 motion shall be due within seven (7) days of service, PLD's opposition, or amended complaint in lieu thereof, shall be due within twenty-eight (28) days thereafter, and Nestlé's reply memorandum shall be due fourteen (14) days thereafter."

validity merely by labeling them as "anticompetitive." Likewise, PLD cannot transform an uncompleted transaction into an enforceable contract.

PLD's antitrust claims suffer from a myriad of deficiencies, each of which independently requires dismissal.

1.     **PLD does not allege antitrust injury**.  PLD's antitrust allegations focus only on injuries that PLD itself allegedly suffered because of the pre-existing agreement between Gerber and Perrigo. But harm to an individual competitor is not sufficient to survive a motion to dismiss; PLD must show that there was harm to competition as a whole in the relevant market. Yet PLD makes nothing more than conclusory allegations that there was any harm to competition more broadly in the infant-formula market.

2.     **PLD fails to define a sufficient product or geographic market**.  PLD defines the relevant market as the market for the sale of *store-brand* infant formula to retailers. But a valid relevant market must account for ***all*** reasonably interchangeable substitutes. *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008). PLD's own Complaint recognizes that ample substitutes are omitted from its market formulation—most significantly, the well-known name-brand infant formula products that three other manufacturers sell to retailers. The name-brand and store-brand products serve identical purposes and sit next to one another on store shelves. Both must therefore be included in the relevant product market. PLD similarly fails to offer any explanation as to why the geographic market is limited to the United States. Accordingly, PLD's antitrust claims fail on this ground alone.

3.     **PLD has not alleged that Gerber had a specific intent to monopolize the market for the sale of store-brand infant formula**.  PLD's allegations are limited to Gerber's alleged breach of the MOU to honor Perrigo's supposed right of first refusal. Only one entity was

impacted by that decision:  PLD. The exclusion of a single competitor does not equal an intent to monopolize an entire market. *Santana Prod., Inc. v. Sylvester & Assocs., Ltd.*, 121 F. Supp. 2d 729, 735 (E.D.N.Y. 1999).

PLD's contract-based claims fare no better. The MOU is not the fully enforceable supply agreement that PLD alleges it to be.  The express language of the MOU between PLD and Gerber makes clear that it was preliminary and therefore unenforceable. Its purpose was perspicuous:  to set out a summary of terms to be included in a more detailed, binding Supply Agreement that never came to be. There is a strong presumption against binding parties to obligations in agreements that, like the MOU, expressly anticipate the preparation and execution of additional contract documents. Because the six-page MOU is hardly typical of the detailed supply agreement customary for a transaction covering many years and many millions of dollars in sales, PLD cannot overcome the strong presumption against the conclusion that the MOU created a binding agreement with respect to its ultimate contractual objective.  While the title of MOU did state that it was "binding," the only obligation it imposed was to use "commercially reasonable efforts" to negotiate a "more detailed, binding supply agreement" within the framework set out in the MOU. Nothing more, nothing less. Accordingly, PLD's efforts to enforce the MOU as a supply agreement that was never executed fail as a matter of law.

## **FACTUAL BACKGROUND**

### A.    **The Infant Formula Market**

Based on the Complaint's allegations, there are currently four manufacturers of infant formula in the United States:  Perrigo, Abbot Laboratories ("Abbot"), Mead Johnson & Company ("Mead Johnson), and Gerber.  Compl. ¶ 28.  Abbot, Mead Johnson, and Gerber each sell infant formula to retailers under their own name-branded labels.  *Id.* ¶¶ 28, 35. PLD alleges Perrigo is the only manufacturer of "store-brand" infant formula, *i.e.*, infant formula sold under a private

label for sale in a specific chain of retail stores such as Walmart or CVS. *Id.* ¶¶ 1-2, 28. As PLD admits, store-brand and name-brand infant formula products are "equivalent"; the only difference is that store-brand formula is allegedly sold at a lower price than name-brand formula. *Id.* ¶ 36.

### B.   PLD's Attempt to Begin Selling Store-Brand Infant Formula

PLD alleges that in late 2019, it identified Gerber as a potential partner to facilitate its plan to sell store-brand infant formula to retailers and began negotiations with Gerber. Compl. ¶ 39.

█████████████████████████████████████████████

████████████████████ *Id.* ¶¶ 30, 43. Gerber and PLD exchanged financial models, discussed volume and pricing, and identified potential retailers as customers for the repackaged infant formula. *Id.* ¶ 45. PLD claims that Nestlé somehow controlled and directed Gerber's negotiations with PLD. *Id.* ¶¶ 48-49. Based on the financial models that the parties exchanged, PLD alleges that Gerber and PLD "estimated tens of millions of dollars in 'Partnership Sales' each year, which would yield millions of dollars in annual profit for PLD." *Id.* ¶ 46.

### C.   The MOU

According to PLD, Gerber and PLD entered into the MOU in February 2021. *Id.* ¶¶ 50-51. The MOU's first paragraph provides that it "is intended to memorialize the intent of the parties, and is intended to create a summary of terms that will be included in a ***more detailed, binding definitive supply agreement between the parties relating to the subject matter hereof*** (the 'Supply Agreement')." Compl. Ex. A at p. 1 (emphasis added). The MOU contemplated that the Supply Agreement would have a seven-year initial term. *Id.* at p. 4.  In describing both Gerber's and PLD's duties, the MOU set out general responsibilities, such as Gerber's duty to manufacture, package, and ship the infant formula and PLD's duty to sell, market, and promote the products. *Id.* at p. 2-3. But the MOU made clear that each party's respective duties would be "described in more detail in the Supply Agreement." *Id.* at p. 2-3. The Supply Agreement would also "contain mutual

warranties, covenants, indemnities, limitations of liability and other terms and conditions customary for agreements of that nature." *Id.* at p. 5. In the last paragraph, the MOU concluded: "This [MOU] is intended to memorialize the ***contemplated terms of the agreement*** of the parties. The parties shall use commercially reasonable efforts to negotiate a Supply Agreement incorporating substantially the terms set for above by June 1, 2021." *Id.* (emphasis added).

### D.    PLD Fails To Enter the Infant Formula Market

PLD asserts that, prior to entering into the MOU, Gerber had a pre-existing supply agreement with Perrigo, which provided Perrigo a right of first refusal to purchase all of Gerber's excess supply of infant formula. *Id.* ¶¶ 7-8, 61. PLD alleges that Gerber and Nestlé notified Perrigo of the MOU and that, in response, Perrigo exercised its right of first refusal under the agreement. *Id.* ¶ 64. PLD alleges that Gerber—at Nestlé's direction— repudiated the MOU to honor Perrigo's pre-existing right of first refusal.  *Id.* ¶¶ 65-67, 72-75.

## <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "a court must accept as true all of the allegations contained in a complaint," the court need not accept pure "legal conclusions." *Id*. Indeed, "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). Of particular significance here, "a naked assertion of conspiracy" does not meet the plausibility standard. *Twombly,* 550 U.S. at 545. PLD has failed to meet the plausibility standard and the Complaint should be dismissed.

## ARGUMENT

### I.    PLD'S ANTITRUST CLAIMS SHOULD BE DISMISSED.

#### A.    PLD Does Not Plausibly Allege The Required Element Of "Antitrust Injury."

To survive a motion to dismiss Sherman Act and Donnelly Act claims, it is well-established that a plaintiff must plausibly plead the existence of an antitrust injury. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (antitrust injury is "a threshold, pleading-stage inquiry"); *Benjamin of Forest Hills Realty, Inc. v. Austin Sheppard Realty, Inc.*, 34 A.D.3d 91, 97 (N.Y. App. Div. 2d Dep't 2006) (plaintiff did not plead "cognizable claim under the Donnelly Act" where complaint failed to allege "injury to competition in the market as a whole"). "The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, 'that the challenged action has had an actual adverse effect on competition ***as a whole*** in the relevant market; to prove it has been harmed as an individual competitor will not suffice.'" *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) (emphasis added); *Capital Imaging v. Mohawk Valley Med. Assoc.*, 996 F.2d 537, 543 (2d Cir. 1993). Accordingly, "[t]he fact that private plaintiffs have been injured by acts that violate the antitrust laws is not enough to confer standing to sue." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005).

Here, PLD alleges that it suffered harm because it purportedly lost profits that it would have made from selling Store-brand infant formula to retailers.  Compl. ¶¶ 86-87.  This is a textbook example of injury to a single competitor, not to competition as a whole. As the Second Circuit has explained, "it is axiomatic that the antitrust laws do not protect a competitor against competition." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007); *see also Gatt Commc'ns*, 711 F.3d at 77 ("Even if the antitrust laws seek to prevent [defendants'] alleged activities because of resulting harms to *competition*, these laws are not concerned with injuries to *competitors* . . ."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 273 (2d

Cir. 1979) (antitrust laws are not meant to help "those who seek protection against the rigors of competition"). Therefore, PLD's allegations about the harm it suffered due to the agreement between Perrigo and Gerber do not satisfy the requirement of an antitrust injury alleging harm to competition as a whole.

PLD also makes the wholly conclusory assertion that, due to the Gerber and Perrigo agreement, "[r]etailers and consumers were deprived of competition in the market, thereby increasing prices, reducing innovation and quality of service, and lowering output." Compl. ¶ 80. But courts in the Second Circuit have routinely rejected such boilerplate allegations of antitrust injury. Directly on point, in *Volmar Distributors, Inc. v. New York Post Co.*, 825 F. Supp. 1153, 1160 (S.D.N.Y. 1993), the court held that the "naked assertion that consumers and retailers of newspapers have been and will be deprived of the benefits of competition by defendants' actions . . . fails to state adequately an antitrust injury because it is wholly conclusory and is unsupported by any of the facts alleged." *Accord N. Am. Energy Sys., LLC v. New England Energy Mgmt., Inc.*, 269 F. Supp. 2d 12, 18 (D. Conn. 2002) (dismissing antitrust claims because "conclusory allegations are insufficient to establish an actual antitrust injury"). PLD's allegations are legally deficient on their face under these standards.

Furthermore, PLD's own Complaint undermines its conclusory allegations of harm to competition. In terms of innovation, PLD admits that it only sought to produce infant formula that was *identical* to those already on the market. Compl. ¶ 36. And Perrigo's alleged right to purchase Gerber's excess capacity meant that the same amount of formula would ultimately be produced— just not by PLD. The Complaint contains nothing supporting any injury to ***competition as a whole***, opposed to injury to PLD.

**B.      PLD Does Not Adequately Allege The Existence Of A "Relevant Market."**

PLD's antitrust claims should be dismissed because PLD fails to allege a legally sufficient relevant market. *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under . . . §§ 1 or 2 of the Sherman Act, or New York's Donnelly Act, a plaintiff must allege a plausible relevant market in which competition will be impaired."). "In defining the market, courts examine both the relevant product and the relevant geographic markets." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 470 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018). Analysis of the relevant market is "essential for assessing the potential harm to competition from the defendants' alleged misconduct." *Concord Assocs., L.P. v. Ent. Properties Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (quoting *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001)).

**First, PLD fails to allege any facts supporting a relevant *geographic* market**. "A relevant geographic market is the 'area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies." *N. Am. Soccer League*, 296 F. Supp. at 470 (quoting *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995)). PLD defines the relevant product market in this case to be "the sale of Store-Brand infant formula to Retailers" and the relevant geographic market to be the United States. Compl. ¶ 31. But PLD offers no facts supporting why the United States is the appropriate geographic market. PLD does not allege that manufacturers cannot sell infant formula to retailers outside of the United States. Nor does PLD allege that Perrigo *only* sells infant formula to manufacturers in the United States. In fact, Perrigo sells infant formula to retailers in Canada as well as the United States. Because PLD ignores that infant formula manufacturers sell to retailers outside the United States and provides no explanation as to why sales would be limited to retailers in the United States, PLD's antitrust claims should be dismissed for failure to allege a relevant geographic market. *See Mathias*, 152 F. Supp. 2d at 483

(dismissing antitrust claims because plaintiff's "failure to define a geographic market with precision makes it impossible to assess the potential harm to competition resulting from [defendant's] alleged misconduct").

**Second, PLD fails to allege any facts supporting a relevant *product* market.**   "When alleging the relevant market in its complaint, a plaintiff must follow the rules of interchangeability and cross-elasticity of demand, and include in its market all interchangeable substitutes." *Bill's Birds Inc. v. Trademarketing Res. Inc.*, 920 F. Supp. 2d 357, 366 (E.D.N.Y. 2013). "A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'" *Concord Assocs., L.P..*, 817 F.3d at 52 (quoting *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam)). Reasonable interchangeability does not require that "products can be seamlessly swapped for each other." *Com. Data Servers, Inc. v. Int'l Bus. Machines Corp.*, 262 F. Supp. 2d 50, 72 (S.D.N.Y. 2003). Instead, this analysis is "driven by whether the consumer would use the products interchangeably." *Bill's Birds Inc.*, 920 F. Supp. 2d at 366. In other words, interchangeability means that "consumers retain the ability to 'switch to a substitute,' thus 'restrain[ing] a firm's ability to raise prices above the competitive level.'" *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 335 (E.D.N.Y. 2019) (quoting *City of New York*, 649 F.3d at 155).

Here, PLD defines the relevant product market as "the sale of Store-Brand infant formula to Retailers," Compl. ¶ 31, and then explains that Perrigo is "the only manufacturer of Store-Brand infant formula sold to retailers in the United States," Compl. ¶ 28. In other words, PLD alleges that the relevant product market is made up entirely of a ***single company***—Perrigo. In defining the market so narrowly, PLD conveniently omits the other three infant formula manufacturers in the

9

United States, each of which sells infant formula to retailers: (1) Abbot Laboratories; (2) Mead Johnson; and (3) Gerber. Compl. ¶ 28. "If a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand . . . a court may grant a Rule 12(b)(6) motion." *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993). Significantly, as the Second Circuit has recognized, antitrust "[c]ases in which dismissal on the pleadings is appropriate frequently involve . . . failed attempts to limit a product market to a single brand . . . that competes with potential substitutes." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001); *see also In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *7 (S.D.N.Y. Sept. 30, 2009) ("Single-brand markets are, at a minimum, extremely rare.") (quotations omitted), *aff'd sub nom. Am. Banana Co. v. J. Bonafede Co.*, 407 F. App'x 520 (2d Cir. 2010); *accord Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984) ("[A]bsent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market."). Thus, PLD's effort to limit the relevant product market to only Store-brand infant formula produced by Perrigo fails as a matter of law.

As the Second Circuit has explained, "[i]nterchangeability implies that one product is roughly equivalent to another for the use to which it is put . . . " *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City*, 124 F.3d at 437). Remarkably, as PLD affirmatively pleads, "Store-Brand infant formula products are manufactured to be the ***same or equivalent*** to the Branded product." Compl. ¶ 36 (emphasis added). Name-brand and Store-brand infant formula serve an identical use for retailers—namely, to be sold to consumers purchasing infant formula.

Courts in this Circuit regularly find that the failure to account for products that serve the same use in the definition of a relevant product market warrants early dismissal. Directly on point, in *Nirvana, Inc. v. Nestle Waters N. Am. Inc.*, 123 F. Supp. 3d 357, 377 (N.D.N.Y. 2015), the plaintiff tried to define the relevant product market as "noncarbonated unflavored still natural spring water," excluding all other types of bottled water beverages, despite the fact that plaintiff's complaint stated, "all bottled water serves the same purpose of quenching thirst." The court found that plaintiff's relevant market was "under-inclusive pursuant to its own defining characteristics of its bottled water because it clearly does not encompass all interchangeable substitute products," and granted the motion to dismiss the complaint. *Id.* at 378; *see also In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *10 (S.D.N.Y. Sept. 30, 2009) (granting motion for summary judgment due to under-inclusive relevant product market consisting of one type of pineapple because different types of pineapples "all appear to have 'precisely the same use and hence surely vie in a common product market'" (quoting *Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273, 1274–1275 (4th Cir. 1977))), *aff'd sub nom. Am. Banana Co. v. J. Bonafede Co.*, 407 F. App'x 520 (2d Cir. 2010). The same result is warranted here.

PLD's only attempt to distinguish Store-brand from Name-brand formula is to assert that Store-brand manufacturers "do not focus on marketing" and that Store-brand formula is sold at a wholly undefined "discounted price" to retailers than Name-brand formula. Compl. ¶ 36. Therefore, PLD asks the Court to assume that Store-brand and Name-brand infant formula exist in separate product markets despite the fact that they are *identical* products which serve *identical* uses merely because one formula is allegedly priced differently than the others. But the Second Circuit has already examined this exact issue and found over forty years ago that Name-brand and Store-brand (or generic) products fall within the same relevant product market. In *Nifty Foods*

11

*Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 840 (2d Cir. 1980), *superseded by statute on other grounds*, the Second Circuit found that brand name and private label (or store-brand) waffles belong in the same product market. There, the plaintiff also acknowledged that there was "no qualitative difference between brand name waffles and private label waffles," and the Second Circuit noted that the "two types of waffles are sold side by side in the same frozen food cases and distinguished only by label and price, and not quality." *Id.* The exact same reasoning applies here to Name-brand and Store-brand infant formula, and both exist in the same relevant product market.

The landmark *Nifty Foods* case is not outdated or an outlier.  Numerous courts across the country that have concluded that Name-brand and Store-brand goods belong in the same product market. *See e.g.*, *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (rejecting relevant product market consisting only of "name brand" furniture); *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 (D. Mass. 2013) ("[L]ower courts across the country have on numerous occasions ruled that both a brand-name drug and its generic analogs can fall within the bounds of a relevant market."). Similarly, courts to consider whether premium and economy products exist in the same product market have routinely found that such products occupy one relevant product market. *See e.g.*, *Liggett & Myers*, 567 F.2d at 1275 (finding that "economy and premium" dog food "have precisely the same use" and thus constitute one product market); *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (rejecting relevant market consisting of only premium ice cream and finding "[a]ll grades of ice cream compete for both retail shelf space and for consumers' attention"), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990); *United States v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129, 145 (N.D. Cal.) (premium and non-premium beer are in same product

market despite "clear price differential"), *aff'd sub nom. Jos Schlitz Brewing Co v. U S*, 385 U.S. 37 (1966).

Indeed, the Supreme Court has recognized that price differences alone do not create separate product markets in many of its seminal antitrust decisions. *See e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) (agreeing with lower court that "medium-priced shoes" did not constitute a separate product market from "low-priced shoes" because both products compete with one another); *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 396 (1956) (finding that cellophane was part of "flexible packaging material market" even though cellophane cost two to three times as much as competitor packaging products); *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975) ("the scope of the relevant market is not governed by the presence of a price differential between competing products").

As the Second Circuit has recognized, "[w]here the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Chapman*, 546 F.3d at 238 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)). That is precisely the case here. Based on the allegations of the Complaint itself, Store-brand formula and Name-brand formula are interchangeable products, and PLD's failure to account for that interchangeability in the definition of its relevant product market requires dismissal of PLD's antitrust claims.

## C.   PLD'S SECTION 1 CLAIM FAILS BECAUSE PLD HAS NOT PLED AN UNREASONABLE RESTRAINT OF TRADE

PLD's Section 1 claim also fails because PLD has not pled an unreasonable restraint of trade. Because "all contracts necessarily restrain trade to some extent," Section 1 of the Sherman

Act prohibits "only 'unreasonable' restraints of trade.'" *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 438 (S.D.N.Y. 2015) (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)). Therefore, to survive a motion to dismiss a Section 1 claim, a plaintiff must allege "'(1) a combination or some form of concerted action between at least two distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason.'" *Bill's Birds Inc.*, 920 F. Supp. 2d at 364 (quoting *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95–96 (2d Cir. 1998)).

Alleged restraints between "entities at different levels of a market structure, such as between a manufacturer and distributor . . . are analyzed under the rule of reason." *Mooney*, 19 F. Supp. 3d at 498; *United States v. Apple, Inc.*, 791 F.3d 290, 321 (2d Cir. 2015) ("[V]ertical restraints—including those that restrict prices—should generally be subject to the rule of reason.") (citing *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007)); *N. Am. Soccer League, LLC*, 296 F. Supp. 3d at 460 ("Courts 'presumptively' apply the rule of reason which requires consideration of 'all of the circumstances of a case' in deciding whether the challenged practice violates Section 1.") (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)). Accordingly, because Gerber is the manufacturer and Perrigo is the distributor of infant formula, PLD's allegation that they entered into an anticompetitive agreement should be analyzed under a rule of reason analysis.

As a preliminary matter, as numerous courts have recognized, contractual rights of first refusal are not, in and of themselves, unreasonable restraints of trade. *See e.g.*, *Satellite Financial Planning Corp. v. First Nat. Bank of Wilmington*, 633 F. Supp. 386, 397 (D. Del. 1986); *National Basketball Association v. Williams*, 857 F. Supp. 1069, 1079 (S.D.N.Y. 1994) (contractual rights of first refusal are nor per se unreasonable). Such provisions are "inoffensive" in themselves, *Ohio*

*Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 829 (7th Cir. 1978), and only may become problematic if they are "conditioned upon the agreement of one party not to deal with the other party's competitors." *Satellite Financial*, 633 F. Supp. at 397 (D. Del. 1986). PLD makes no such allegations here, and thus there is nothing facially problematic with the alleged right to excess capacity provision in Gerber's agreement with Perrigo. Nor is there anything problematic about Gerber using Perrigo as its sole distributor of store-brand infant formula. The Second Circuit has been clear that even an exclusive distributorship agreement is "presumptively legal." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006).

PLD also fails to satisfy the elements of a Section 1 claim. First, PLD fails to allege "concerted action" between Perrigo and Gerber. "In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). Here, PLD alleges that Gerber had an agreement with Perrigo to produce Store-brand infant formula, and that in this agreement Perrigo had a "first right" to Gerber's excess capacity. Compl ¶ 8. Based on that fact alone, PLD alleges the existence of an anticompetitive agreement in restraint of trade. However, the mere existence of a commercial contract between two parties is not sufficient to establish concerted action at the motion to dismiss stage. "A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Even accepting that this is an accurate description of Gerber's relationship with Perrigo, PLD alleges nothing beyond the existence of one contractual term between two separate entities. If that alone were sufficient to survive a motion to dismiss, every contract could be swept up under the umbrella of "concerted action," which would render the requirement meaningless.

15

Second, PLD's Section 1 claim also fails because PLD fails to demonstrate that the agreement between Perrigo and Gerber had an adverse impact on the market. The rule of reason analysis requires the plaintiff shows that "the challenged action had an actual adverse effect on competition as a whole in the relevant market." *Tops Markets*, 142 F.3d at 96 (quoting *Capital Imaging*, 996 F.2d at 543). As the Second Circuit has recognized, there is "no adverse effect on competition as a whole" where a single plaintiff was prevented from entering the relevant market. *Id.*

Actual adverse effect can be demonstrated in one of two ways. First, a plaintiff may allege "direct evidence of harm to competition" through "higher prices, reduced output, or lower quality in the market as a whole." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016). As explained above, *supra* at 6-7, PLD has failed to allege any actual adverse effect on competition because it has wholly failed to allege an antitrust injury. Second, a plaintiff may demonstrate adverse effect indirectly by "establishing that the alleged conspirators had sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that the challenged behavior' has harmed competition." *Id.* (quoting *Tops Mkts.*, 142 F.3d at 97). "'Market power' is 'defined as the ability of a single seller to raise prices and restrict output.'" *Id.* (quoting *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 265 (2d Cir. 2001)).

PLD has failed to allege sufficient market share because its allegation of a single-company market consisting solely of Perrigo's Store-brand formula is contrived and legally deficient, *supra* at 9-13. In addition, PLD makes no allegation about the percentage of the general infant formula market that Perrigo and/or Gerber control. ████████████████████████████
████████████████████████████████████████████████████████████

███████████████ Compl. ¶ 42. Such allegations fail to establish that Gerber and/or Perrigo have sufficient market power in the infant formula market to harm competition.

The Southern District of New York considered this same issue in *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 502 (S.D.N.Y. 2014). In that case, the plaintiff similarly sought to survive a motion to dismiss a Section 1 claim under the rule of reason analysis by alleging the defendant operated in a single-brand market controlled by the defendant. The court found that the plaintiff failed to allege sufficient market power under the rule of reason analysis because 1) the single-brand market was implausible, and 2) the plaintiff failed to allege any facts about the percentage of the broader multi-brand market that defendant controlled. *Id.* The same result is warranted here. Because PLD alleged a deficient single-company market and fails to state any facts about Gerber and/or Perrigo's size in the broader market for infant formula, PLD's Section 1 claim should be dismissed for the same reasons in *AXA Advisors*.

### D.   PLD'S CONSPIRACY TO MONOPOLIZE CLAIM SHOULD BE DISMISSED BECAUSE PLD HAS NOT ALLEGED SPECIFIC INTENT TO MONOPOLIZE

PLD's conspiracy to monopolize claim also fails for the wholly separate reason that PLD has failed to allege that Gerber had a specific intent to monopolize.  To survive a motion to dismiss a conspiracy to monopolize claim under Rule 12(b)(6), a plaintiff must plead: "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Santana Prod., Inc. v. Sylvester & Assocs., Ltd.*, 121 F. Supp. 2d 729, 735 (E.D.N.Y. 1999).  "To allege a conspiracy to monopolize an entire market, Plaintiff must allege more than unfair trade practices directed at one competitor." *Id.* at 736.  Instead, "[t]he specific intent necessary to establish a conspiracy to monopolize is the intent to enable or maintain a monopoly position in the relevant market." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 383 (S.D.N.Y. 2016). Accordingly, "where only one competitor is alleged to be targeted, as opposed to an entire market,

a conspiracy to monopolize claim *must fail*." *Santana Prod.*, 121 F. Supp. 2d at 736 (emphasis added).

PLD has alleged no facts supporting its assertion that Gerber had a specific intent to monopolize a relevant market. Here, the *only* action that PLD alleges that Gerber took in furtherance of the alleged "conspiracy" was honoring Perrigo's "first right" for Gerber's excess capacity *one time*. Compl. ¶ 67. PLD makes the conclusory assertion that Gerber was part of a conspiracy "to keep any and all new entrants out of the relevant market," Compl. ¶ 117, but there are no facts even suggesting that Gerber took any action that would impact any other real or potential infant formula suppliers other than PLD. Nothing about honoring Perrigo's contractual first right to excess capacity in this instance suggests that Gerber sought to monopolize the entire infant formula market.

In *Santana Products*, the Court found the plaintiff "failed adequately to allege that [d]efendants' actions were aimed at monopolizing a portion of the toilet partition market in general and not merely at the elimination of plaintiff as a competitor." *Id.* at 737. That is precisely the case here. The only entity alleged to be impacted by Gerber's decision not to produce Store-brand formula for PLD is PLD itself. There is nothing that suggests that future partnership wouldn't be possible or that this was anything other than a single decision concerning a single company. Therefore, because PLD has not alleged Gerber had a specific intent to monopolize the entire market, PLD's Section 2 claim should be dismissed.

### E.   PLD'S STATE ANTITRUST CLAIMS SHOULD BE DISMISSED FOR THE SAME REASONS PLD'S FEDERAL ANTITRUST CLAIMS FAIL

PLD's state antitrust claims under the Donnelly Act, N.Y. Gen. Bus. Law § 340, should be dismissed for the same reasons that PLD's federal antitrust claims should be dismissed. PLD relies upon the same allegations to sustain its Donnelly Act claims that serve as the basis of its federal

antitrust claims. Compl. ¶¶ 131-146 (alleging liability under the Donnelly Act for unreasonable restraint of trade (Count Five) and conspiracy to monopolize (Count Six)). The Donnelly Act "is modeled after the Sherman Act and 'should generally be construed in light of Federal precedent.'" *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 101 (2d Cir. 2019) (quoting *Gatt Commc'ns, Inc.*, 711 F.3d at 81); *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988) (The Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result.").

Accordingly, when courts dismiss Sherman Act claims under Rule 12(b)(6), dismissal of state antitrust claims is also warranted. *See e.g.*, *Biocad JSC*, 942 F.3d at 101 ("As [plaintiff] has not stated a plausible claim for relief under the Sherman Act, its Donnelly Act claim similarly fails."); *Gatt Commc'ns, Inc.*, 711 F.3d at 82 (affirming dismissal of Donnelly Act claims where Sherman Act claims were dismissed for lack of antitrust standing). Therefore, because PLD failed to plausibly allege its Sherman Act claims, Counts Five and Six should also be dismissed.

## II.     THE MOU IS NOT A BINDING SUPPLY AGREEMENT

PLD's breach of contract claim fails because the MOU is not binding.  In determining whether a preliminary agreement is binding as to its ultimate contractual objective, New York law looks to whether the parties intended to be so bound, whether there has been partial performance, whether the preliminary agreement contains all material terms, and whether the type of agreement is usually reduced to a formal writing.  *See Tri-Cnty. Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 170 (E.D.N.Y. 2007), *aff'd*, 301 F. App'x 11 (2d Cir. 2008).  Applying these standards, the MOU does not constitute a binding agreement.

## A.      There Is No Intent To Be Bound

In assessing the legal implications of a preliminary agreement, the intent of the parties is the most important factor.  *Id.*  And there is a strong presumption against a conclusion that parties are bound to obligations in an agreement that "expressly anticipate[s] future preparation of and execution of contract documents."  *See LPD New York, LLC v. Adidas Am., Inc*., No. 15CV6360MKBRLM, 2017 WL 1162181, at *8 (E.D.N.Y. Mar. 27, 2017) (quoting *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc*., 401 B.R. 598, 619 (S.D.N.Y. 2009)).  Hence, courts within the Second Circuit "have repeatedly found that language anticipating future preparation and execution of contract documents . . . prevents a finding of intent to be bound."  *Id.* at *9 (collecting cases).

That strong presumption applies here and defeats any claim for breach predicated on the MOU.  The MOU was merely a first step toward a more formal agreement.  The MOU's first paragraph emphasizes that its purpose was to "to create a summary of terms that will be included in a more detailed, binding definitive supply agreement between the parties related to the subject matter hereof."  Compl. Ex. A at p. 1.  The last paragraph reiterates that purpose and sets out the parties' end-goal: "The parties shall use commercially reasonable efforts to negotiate a Supply Agreement incorporating substantially the terms set forth above by June 1, 2021." *Id.* at p. 5.  That language makes clear that the MOU is not binding.  *See Kosher Provisions, Inc. v. Blue & White Food Prod. Corp*., No. CV-04-361 (NGG)(SAC), 2005 WL 1890039, at *4 (E.D.N.Y. Aug. 9, 2005) ("The requirement that Blue & White use 'commercially reasonable efforts to . . . conclude' an agreement makes clear that no binding distribution agreement had previously been or was then created by the 2002 Agreement.  Rather, the parties were clearly still in the process of negotiating.").

**B.      The MOU Is Not a Typical Supply Agreement and Lacks Critical Terms**

The MOU also is not typical of a detailed supply agreement standard in the industry.  To that end, "New York courts have recognized that the 'complexity and duration of [an] alleged agreement' is particularly significant in determining whether it must be reduced to formal writing in order to be fully enforceable."  *Brown v. Cara*, 420 F.3d 148, 155 (2d Cir. 2005) (quoting *Warwick Assocs. v. FAI Ins. Ltd*., 275 A.D.2d 653 (N.Y. App. Div. 1st Dep't 2000)).  In *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc*., 145 F.3d 543, 551 (2d Cir. 1998), for example, the Second Circuit rejected a claim that a two-page preliminary document constituted a binding agreement to buy complex intellectual property rights.  The million-dollar acquisition at issue there involved the "rights to software and a license to use a database" and contemplated a five-year period of employment for the seller's principals.  *Id.*  As the Second Circuit explained, "[i]n view of the size of the transaction, the nature of the assets being purchased, and the length of the contemplated employment contracts, the Agreement clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts."  *Id.*

Even more so than the intellectual property purchase in *Adjustrite*, the transaction here is one that calls for a detailed and formal contract, not a preliminary agreement.  Infant formula supply agreements—like the final agreement contemplated in the MOU—are lengthy documents, setting out the parties' rights and obligations on host of different topics.  The MOU itself drives that point home:  the contemplated supply agreement would govern tens of millions of dollars in purchases over the course of a seven-year term.  *See* Compl. Ex. A at p. 4; *see also* Compl. ¶ 46 ("[T]he parties estimated tens of millions of dollars in 'Partnership Sales' each year . . .").  The MOU further provided that "[t]he Supply Agreement shall contain mutual warranties, covenants, indemnities, limitations of liability and other terms and conditions customary for agreement of that

21

nature." *Id.* at p. 5. None of those "customary" terms are found in the MOU. The years' long, multi-million-dollar supply relationship at issue is exactly the type of complex transaction that would necessarily be encompassed in a formal agreement to be fully enforceable. *See Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc*., No. 17-CV-882 (RA) (KHP), 2020 WL 9214290, at *6 (S.D.N.Y. Nov. 4, 2020) ("The instant contract is also of the type that, given its complexities, would be expected to be reduced to a formal writing. The Settlement Term Sheet contemplated more than a decade of contractual relationship between the parties, the transfer of intellectual property, and a total value exceeding $1 million. An agreement of this complexity and duration typically is memorialized in a formally executed contract."), *report and recommendation adopted*, No. 17-CV-882 (RA), 2021 WL 1425355 (S.D.N.Y. Apr. 15, 2021). PLD thus cannot overcome the strong presumption against the conclusion that a binding agreement existed as to the MOU's ultimate contractual objective.

### C.    The MOU Is an Agreement to "Use Commercially Reasonable Efforts to Negotiate" Only

PLD alleges that Gerber entered into a binding agreement with it because the word "binding" is contained in the title of the MOU. But the MOU did not take the leap from a preliminary agreement to a final, comprehensive Supply Agreement simply because it was titled "binding." Instead, the MOU only expresses the parties' intent to enter into a "more detailed, *binding* supply agreement." Compl. Ex. 1 at p. 1 (emphasis added). The express language of the MOU makes clear that its only purpose was "intended to create a summary of terms [to be included" in that more detailed, binding definitive supply agreement. *Id*.

That said, the MOU did bind the parties—but only for a limited purpose, which was to bind the parties to "use commercially reasonable efforts" to negotiate a "more detailed, binding" Supply Agreement. Compl., Ex. 1 at p. 5. As an agreement to negotiate, the MOU did not commit the

parties to their ultimate contractual objective; it committed the parties only to further negotiations within the framework set forth in the MOU. *See Brown*, 420 F.3d at 153 (MOU that contemplated execution of more formal contract created only obligations to negotiate within the framework of the agreement). The obligation to negotiate does not guarantee that the final agreement will be executed. *Id.* at 157. And a party to a preliminary commitment, even if it is binding, "has no right to demand performance of the transaction." *Adjustrite Sys., Inc*., 145 F.3d at 548.

## CONCLUSION

For the foregoing reasons, PLD's Complaint should be dismissed with prejudice.

Dated:   January 12, 2022

KELLEY DRYE &WARREN LLP

By:   /s/ *Geoffrey W. Castello*
       Geoffrey W. Castello
       Whitney M. Smith
       3 World Trade Center
       175 Greenwich Street
       New York, NY 10007
       (212) 808-7800
       gcastello@kelleydrye.com
       wsmith@kelleydrye.com

       *Attorneys for Defendant*
       *Gerber Products Co.*

       MAYER BROWN LLP

       */s/ Carmine R. Zarlenga*
       Carmine R. Zarlenga
       Oral D. Pottinger
       1999 K Street NW
       Washington, DC 20006
       T: (202) 263-3227
       F: (202) 263-3300

czarlenga@mayerbrown.com
opottinger@mayerbrown.com

*Counsel for Defendant*
*Gerber Products Co.*