UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- x

P & L DEVELOPMENT, LLC,

                                    Plaintiff,                           **OPINION & ORDER**

                    -against-                                            **21-cv-5382 (NG) (AS)**

GERBER PRODUCTS COMPANY,
NESTLÉ S.A., PERRIGO COMPANY PLC,
L. PERRIGO COMPANY and PBM
NUTRITIONALS, LLC,

                                    Defendants.

--------------------------------------------------------- x
GERSHON, United States District Judge:

## I.      Introduction

For alleged antitrust violations, Plaintiff P & L Development, LLC ("PLD") sues Gerber Products Company ("Gerber"), Perrigo Company PLC ("PCPLC"), L. Perrigo Company ("LPC") and PBM Nutritionals, LLC ("PBM") (PBM, together with PCPLC and LPC, "the Perrigo Defendants") as well as Nestlé S.A.[1]

PLD brings claims against all Defendants for unreasonable restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1, conspiracy to monopolize under Section 2 of the Sherman Act, 15 U.S.C. § 2, and analogous state law under the Donnelly Act, N.Y. Gen. Bus. Law § 340.  The Perrigo Defendants are named as defendants for unlawful maintenance of monopoly claims under Section 2 of the Sherman Act and the Donnelly Act, and a tortious interference with contract claim.  PLD also brings a breach of contract claim against Gerber.

---

[1] Because, as discussed below, I find that this court lacks personal jurisdiction over Nestlé S.A., I do not include Nestlé S.A. within the grouping of "Defendants" which will be referenced in this opinion, and do not describe the claims that PLD filed against Nestlé S.A.

Before the court are Nestlé S.A.'s motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and all Defendants' motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, Nestlé S.A.'s motion to dismiss for lack of personal jurisdiction is granted, and Defendants' motions to dismiss for failure to state a claim are denied.

## II.    Facts as Alleged in the Complaint

The following facts are drawn from the Complaint and are assumed to be true for purposes of this motion.[2]

### a.  Overview of the Action

This case arises from PLD's efforts to bring competition to the alleged market "for the sale of Store-Brand infant formula" to U.S. retailers, such as Walmart, Kroger, CVS, Target, Meijer, Rite Aid, and Walgreens, in the face of Gerber and the Perrigo Defendants' actions to block PLD from entering the market.  Complaint ¶¶ 1, 31.  "Store-brand" products are products sold under private label brands that a retailer brands, manages, and sells in a specific chain of stores, in contrast to "branded" products, which a manufacturer or distributor brands and retailers sell nationally.

### b.  Infant Formula Manufacturers

There are only four United States Food and Drug Administration ("FDA")-approved manufacturers of infant formula in the United States: (1) the Perrigo Defendants, (2) non-party Abbott Laboratories ("Abbott"), (3) non-party Mead Johnson & Company LLC ("Mead

---

[2] Pursuant to an order entered prior to the reassignment of this case to me, the Complaint was filed with certain limited redactions.  *See* Dkt. No. 44.  Although I have reviewed the unredacted version of the Complaint, which was filed under seal, this opinion refers only to the allegations in the publicly available version.  The allegations in the publicly available version of the Complaint are sufficient to address the motions to dismiss, as none of the redacted allegations alter my analysis.

Johnson"), and (4) Gerber.  The Perrigo Defendants' CEO explained that this is because there are "significant" and "high moats" to becoming an FDA-approved infant formula manufacturer.  *Id.* ¶ 39.  The most significant of these barriers are: (1) the cost to construct an infant formula manufacturing plant, which costs tens of millions of dollars and takes years to complete, and (2) the expense and time required to conduct clinical trials required under FDA regulations for marketing of new infant formula products.  As to the latter barrier, pursuant to 21 C.F.R. § 106.96, all new infant formula manufacturers are required to conduct lengthy and expensive infant growth monitoring studies for each formula.  Such studies cost millions of dollars per study and take at least two years to complete.  A manufacturer that seeks to enter the store-brand infant formula market, specifically, would require at least four distinct infant formulas; thus, accompanying clinical trials would cost tens of millions of dollars.  The Perrigo Defendants' CEO explained that it has been "20 years since the FDA approved another" infant formula manufacturer.  *Id.*  Unlike new manufacturers, existing manufacturers are "grandfathered in" and exempt from the requirement to conduct growth monitoring studies for their existing formulas. *Id.* ¶ 41.

Three of the four infant formula manufacturers — Abbott, Mead Johnson, and Gerber — do not sell store-brand infant formula to U.S. retailers, but instead sell infant formula only under their own national brands. Those national brands are: (1) the Similac®-brand (sold by Abbott), (2) the Enfamil®-brand (sold by Mead Johnson), and (3) Gerber's Good Start®-brand.  Both Abbott and Mead Johnson lack the capacity to expand their production of infant formula beyond their current levels utilized for their own national brands, and they have no ability to further scale up production to sell infant formula for resale as store-brand infant formula to U.S. retailers.

Gerber, by contrast, "possesses enough excess capacity to supply the entire Store-Brand infant formula market." *Id.* ¶ 60.

Currently, the Perrigo Defendants are the only manufacturers and suppliers of infant formula that is sold as store-brand infant formula to U.S. retailers.  The Perrigo Defendants' U.S. store-brand infant formula business generates hundreds of millions of dollars annually with high profit margins.  The Perrigo Defendants produce twelve infant formulas for sixty-eight retailers, including Walmart, Kroger, CVS, Target, Meijer, Rite Aid, and Walgreens, which are sold in more than 40,000 retail locations throughout the United States.

### c.  Infant Formula Manufacturers' Sales Strategy

While store-brand infant formula products are manufactured to be the same or equivalent to the branded products, the manufacturers market them very differently. The manufacturers of branded infant formula spend hundreds of millions of dollars annually in advertising and marketing, competing to attract new parents to their branded formulas.  By contrast, store-brand infant formula suppliers do not focus on marketing.  Instead, they sell the product to retailers at significantly discounted prices so that retailers can (1) offer the product to consumers at a significant discount to the branded products and (2) still make more profit on the sale of the store-brand product than they do on the branded products.

### d.  The Parties

PLD is a leading manufacturer, packager, and distributor of store-brand over-the-counter ("OTC") pharmaceuticals and consumer health care products.  PLD provides the full spectrum of manufacturing, packaging, distribution, and creative solutions for a broad range of high-quality store-brand health care products.  Its products include solid and liquid dose OTC analgesics, digestive, cough/cold, allergy, and sleep medication products.  At any given U.S. retailer, for

example, an allergy sufferer may find PLD-supplied products for sale under the retailer's brand on the same shelf as well-known branded products, but at a price that is typically 30% less.

The Perrigo Defendants manufacture and sell pharmaceutical and personal care products, including, as noted, store-brand infant formula. They are the largest supplier of store-brand OTC pharmaceutical products in the United States and PLD's primary competitors for the sale of store-brand OTC pharmaceutical products to U.S. retailers. Gerber manufactures, and sells baby food, infant formula, and other child nutritional products.

### e. PLD Decides to Partner with Gerber

At least as early as late 2019, PLD sought to enter the U.S. store-brand infant formula market. Recognizing that the barriers to manufacturing infant formula are high, PLD decided to partner with an existing infant formula manufacturer. By partnering with such a manufacturer, PLD could rapidly enter the market and sell store-brand infant formula to U.S. retailers without the significant expenditures and burden of lengthy clinical trials, including infant growth monitoring studies. Among the existing manufacturers that did not already manufacture infant formula for resale as store-brand infant formula, namely Abbott, Mead Johnson, and Gerber, only Gerber had the excess capacity to sell its product to PLD for resale to U.S. retailers as store-brand infant formula. Therefore, PLD chose Gerber as its partner.

### f. PLD and Gerber Negotiate

Beginning in late 2019, and continuing through early 2021, PLD and Gerber discussed a broad framework and specific terms of a partnership for PLD to purchase Gerber's infant formula and resell it as store-brand infant formula to U.S. retailers. Based on PLD's history of "entering markets dominated by Perrigo," *id.* ¶ 44, the parties discussed the rate at which they expected PLD to capture market share. They approximated that PLD would capture ten percent

of the market by the end of year one, twenty percent by the end of year two, and thirty percent by the end of year three.  Gerber and PLD also exchanged financial models, discussed volume and pricing, identified potential U.S. retailer customers, and created detailed timelines for bringing various formulations of infant formula products to market under the partnership.  Based on the financial models that the parties exchanged, they estimated tens of millions of dollars in "Partnership Sales" each year, which would yield millions of dollars in annual profit for PLD. *Id.* ¶ 46.

### g.  Memorandum of Understanding

On February 26, 2021, PLD and Gerber executed an agreement attached as Exhibit 1 to the Complaint and titled "MEMORANDUM OF UNDERSTANDING (BINDING)."  MOU 1. The MOU states that it is "intended to memorialize the intent of the parties and is intended to create a summary of terms that will be included in a more detailed, binding definitive supply agreement between the parties related to the subject matter hereof (the 'Supply Agreement')." *Id.*  It further provides that it "is intended to memorialize the contemplated terms of the agreement of the parties. The parties shall use commercially reasonable efforts to negotiate a Supply Agreement incorporating substantially the terms set forth above by June 1, 2021." *Id.* 5.

Within the MOU, there is a table of twelve categories.  For example, some of the included categories are "Summary of Terms," "Product," "Exclusivity," "Gerber's Duties," "PLD Duties," "Product Price" and "Minimum Order Volumes, Other Gerber Requirements." *Id.* 1–3, 5.  Within each category, there is a description of terms.  For example, with respect to "Product Price," the MOU provides a price PLD will pay Gerber for product.  *Id.* 3. The MOU states that the price term "is valid for a period of one year from the date of this MOU and the

price is to be adjusted annually at each anniversary of this MOU to reflect increases or decreases in Gerber's actual, out-of-pocket costs of materials or direct labor." *Id.* 3.

> With respect to "Forecast and Purchase Order Requirements," the MOU provides:

> Each month PLD shall provide Gerber a rolling twelve (12) month Product requirement forecast that would reflect the Purchase Orders for each of the three (3) 'firm' months immediately following that forecast date, and an estimated non-binding forecast for each of the nine (9) months immediately following the three (3) firm months.

> Each month PLD shall provide Gerber a Purchase Order for the month that is newly added to the 'firm' three (3) month period. All Purchase Orders must be placed a minimum of twelve (12) weeks prior to the required delivery date for Product.

> Until execution of a Definitive Agreement by both parties, all purchases and sales will be pursuant to PLD's standard Purchase Order terms and conditions, a copy of which has been provided to Gerber.

*Id.* 5.

> Finally, with respect to "Term/Termination," the MOU states:

> The Parties agree that while the Term of the Supply Agreement is contemplated as set forth below, the Parties will begin certain activities related to the performance of the Supply Agreement in preparation of the Parties [sic] intended obligations, and as set forth herein. Further, the parties agree that the terms of this MOU shall govern the Parties' performance until such time as the Supply Agreement is fully executed. The Term of the Supply Agreement, is contemplated to commence on June 1, 2021, and continue for an initial period of seven (7) years. The Term of the Supply Agreement shall automatically renew for up to three (3) successive renewal terms of two (2) years each unless either party gives the other party written notice of non-renewal at least nine (9) months prior to the date of expiration of the initial term or any renewal term.

> PLD shall have the right to terminate this MOU if, Gerber fails to file the notice required by 21 CFR 106.110 with the FDA with respect to at least two of the Initial Products on or before December 31, 2021.

> Gerber shall have the right, upon thirty (30) days written notice, to terminate this MOU if, Gerber as part of its ordinary business, decides to exit the infant formula business or divests its infant formula business or alternatively elects to cease manufacturing infant formula.

Either Party shall have the right to terminate this MOU and, if executed, the Supply Agreement, if PLD's purchases of such Product (calculated in accordance with GAAP) for the calendar year 2023 and any calendar year thereafter are less than $5,000,000.

Either Party's notice shall be submitted in writing and shall be effective thirty (30) days following delivery to the other Party.  Upon receipt of any such notice of termination, Gerber shall immediately cease work on any Purchase Orders submitted by PLD, and PLD shall pay Gerber for any completed shipments of Product received by PLD prior to the effective date of termination.

Either Party shall have the right to terminate this MOU upon immediate written notice if the other Party is in material breach or default of any of the obligations or provisions of this MOU and fails to cure the same within thirty (30) calendar days following receipt of written notice of such breach.

*Id.* 4.

### h.  Perrigo's Anticompetitive Agreement with Gerber

Unbeknownst to PLD during the negotiation and execution of the MOU, Gerber had previously entered into an agreement with the Perrigo Defendants to give the latter "a 'first right' to Gerber's excess capacity."  Complaint ¶¶ 7–8.  This was later explained to PLD by Gerber's CEO Tarun Malkani.  By invoking their "first right," the Perrigo Defendants had the ability to block any other competitor from entering the store-brand infant formula market.  *Id.* ¶ 8.  In exchange, the Perrigo Defendants agreed that Gerber would "directly and/or indirectly" reap a share of the Perrigo Defendants' profits.  *Id.* ¶ 61.  The Complaint describes this agreement as the "Anticompetitive Agreement."  *Id.* ¶ 7–8.

### i.  Gerber Repudiates the MOU

Soon after PLD and Gerber executed the MOU, and with Gerber's knowledge and approval, PLD began contacting U.S. retailers, including Walmart and Walgreens, to promote the PLD-Gerber partnership and the upcoming availability of an alternative store-brand infant formula to the one sold by the Perrigo Defendants.  In April 2021, during separate meetings with Walmart and Walgreens, PLD introduced its plan to enter the market for the sale of store-brand

infant formula market to U.S. retailers.  Soon after those meetings, PLD scheduled a May 13, 2021 meeting with Walmart to further discuss PLD's entry into the market and the terms of a potential supply agreement between PLD and Walmart.

Around this same time, Gerber notified the Perrigo Defendants of the PLD MOU, and the Perrigo Defendants invoked their "'first right' of refusal" under Defendants' Anticompetitive Agreement.  *Id.* ¶ 64.  The Perrigo Defendants did so intending that it would cause Gerber to breach the MOU.

On May 12, 2021, the day before PLD's scheduled meeting with Walmart, Gerber informed PLD that Gerber needed to put its performance of its obligations under the MOU "on hold" for up to three months because of instructions it had received regarding "some other deal" then-unknown to PLD.  *Id.* ¶ 65.  The next day, PLD asked Gerber to provide more information about the other deal, including an explanation of how, if at all, Gerber anticipated the other deal might affect the parties' timeline for bringing store-brand infant formula to market under the PLD-Gerber partnership.  Malkani then informed PLD that the other deal concerned the Perrigo Defendants.  He explained that the Perrigo Defendants had a "first right" for Gerber's business with respect to store-brand infant formula.  *Id.* ¶ 67.  After learning that Gerber would be putting its performance under the contract "on hold," PLD cancelled its meeting with Walmart.  *Id.* ¶ 68.

The following week, PLD sent Gerber a letter requesting assurances that Gerber intended to perform its obligations under the MOU.  Gerber's response was to deny "the very existence" of the MOU.  *Id.* ¶ 69.  On several occasions, PLD followed-up with Gerber, asking for assurances that Gerber was taking the necessary steps to fulfill its obligations under the MOU, including filing documents with the FDA.  Gerber ignored PLD's requests for such assurances.

On September 21, 2021, Gerber's General Counsel Kevin Goldberg advised PLD that Gerber had taken no steps, and would not take any steps, to file the documents that the MOU required Gerber to file with the FDA.  Instead, Goldberg explained that Gerber could not perform its obligations under the MOU "due to a pre-existing project with a third party," which Malkani had explained was the Perrigo Defendants.  *Id.* ¶ 72.

In a letter dated September 22, 2021, PLD informed Gerber that PLD considered Gerber's conduct to be a repudiation, and material breach, of the MOU.  The letter further explained that PLD considered the repudiation final, PLD's performance under the MOU excused, and the MOU terminated.  Prior to Gerber's repudiation, PLD "had performed all of its obligations" under the MOU.  *Id.* ¶ 152.

## III.  Discussion

### a.  Nestlé S.A.'s Rule 12(b)(2) Motion

Nestlé S.A. argues that this court lacks personal jurisdiction over it.  When challenged, it is the plaintiff's burden to demonstrate "personal jurisdiction over a person or entity against whom it seeks to bring suit."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  "[I]n deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway.  It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion."  *Johnson v. UBS AG*, 791 F. App'x 240, 241 (2d Cir. 2019) (alteration in original) (quoting *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013)).  "Where, as here, a court relies on pleadings and affidavits, rather than conducting a full-blown evidentiary hearing, the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant."  *JCorps Int'l, Inc. v. Charles &*

*Lynn Schusterman Fam. Found.*, 828 F. App'x 740, 742 (2d Cir. 2020) (quoting *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)).  While affidavits submitted by both parties may be considered, *Johnson*, 791 F. App'x at 243, the materials are construed in the light most favorable to, and any factual disputes are resolved in favor of, plaintiff. *Dorchester*, 722 F.3d at 85–86.  However, plaintiff cannot meet its burden through conclusory allegations or assertions or those based on mere conjecture.  *See JCorps*, 828 F. App'x at 744–46.

"Before a court may exercise personal jurisdiction over a defendant, three requirements must be met: (1) the plaintiff's service of process upon the defendant must have been procedurally proper; (2) there must be a statutory basis for personal jurisdiction that renders such service of process effective; and (3) the exercise of personal jurisdiction must comport with constitutional due process principles." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021) (internal quotation marks omitted).  PLD argues that it has made a sufficient *prima facie* showing that a statutory basis exists for the exercise of personal jurisdiction over Nestlé S.A under § 12 of the Clayton Act, under New York CPLR 302(a)(2) and under Federal Rule of Civil Procedure 4(k)(2).  As will be seen, PLD fails to make such a showing.

### i.  Clayton Act § 12

Section 12 of the Clayton Act provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.

In *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408 (2d Cir. 2005), the Second Circuit held that Section 12's "service of process provision applies (and, therefore, establishes personal jurisdiction) only in cases in which its venue provision is satisfied." *Id.* at 423. Section 12, therefore, "properly confer[s] personal jurisdiction over a defendant only when the action is brought in the district where the defendant resides, is found, or transacts business, that is, the district where Section 12 venue lies." *Id.* at 427 (internal quotation marks omitted).

Plaintiff does not argue that Nestlé S.A. resides, is found, or transacts business in the Eastern District of New York. PLD argues only that Nestlé S.A. waived any challenge to personal jurisdiction under § 12 because Nestlé S.A. does not also challenge venue under that section. This argument fails. Improper venue and lack of personal jurisdiction are two independent grounds for dismissal under Rule 12, even though, as *Daniel* held, in Clayton Act § 12 cases, one depends on the other. Choosing not to bring a Rule 12(b)(3) motion challenging whether § 12's venue provision is satisfied does not waive a Rule 12(b)(2) motion challenging personal jurisdiction under that section. *See Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 695 n.11, 701 (S.D.N.Y. 2019). As this is the only basis that PLD argues justifies the assertion of personal jurisdiction over Nestlé S.A. under § 12, PLD does not meet its burden as to this statutory basis.[3]

### ii.  N.Y. CPLR 302(a)(2)

Next, PLD argues that N.Y. CPLR 302(a)(2) provides a statutory basis for the exercise of personal jurisdiction over Nestlé S.A.

---

[3] The cases cited by PLD, *Kentucky v. Marathon Petroleum Co.*, 464 F. Supp. 3d 880 (W.D. Ky. 2020) and *Kitto v. Thrash Oil & Gas Co.*, 1990 WL 33217 (W.D.N.Y. Mar. 20, 1990), do not support PLD. Contrary to PLD's argument, they do not stand for the proposition that the failure to challenge venue under Clayton Act § 12 waives a challenge to personal jurisdiction.

That section permits a court to "exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act." PLD alleges that Nestlé S.A. is "headquartered in Vevey, Vaud, Switzerland and has its principal place of business in Switzerland." Complaint ¶ 13. It does not try to establish that Nestlé S.A. itself committed a tortious act within New York, but relies only on an argument that Nestlé S.A. conspired with Gerber and the Perrigo Defendants to block plaintiff from entering the market.

As the Second Circuit explained in *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118 (2d Cir. 2023), a plaintiff must meet a two-part test to establish personal jurisdiction over a co-conspirator under CPLR 302(a)(2). A "plaintiff must allege: first, that the defendant was 'a part of a conspiracy involving . . . overt . . . acts in New York.'" *Id.* at 126 (quoting *Lawati v. Montague Morgan Slade Ltd.*, 102 A.D.3d 427, 428 (1st Dept 2013)). Second, it must allege:

> (a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, *or* at the request of or on behalf of the out-of-state defendant.

*Id.* (quoting *Berkshire Bank v. Lloyds Banking Grp. plc*, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022)).

Attached to its motion, Nestlé S.A. provides the declaration of Leanne Geale, the "Executive Vice President and General Counsel, Corporate Governance and Compliance for Nestlé S.A." Geale Decl., at ¶ 2. According to the declaration, Nestlé S.A. is a Swiss corporation with its principal place of business in Switzerland. It is the "ultimate parent of hundreds of separate corporate entities within the Nestlé group, including co-defendant Gerber." *Id.*, at ¶ 6. More specifically, "Gerber is a direct wholly owned subsidiary of Nestle Holdings,

Inc., which is a wholly owned subsidiary of NIMCO US, Inc.  NIMCO US, Inc. is an indirect wholly owned subsidiary of Nestlé S.A.  Therefore, Gerber is a subsidiary of multiple Nestlé S.A. subsidiaries." *Id.*  Geale further states that Nestlé S.A. "did not control the contracting and negotiation activities" of Gerber with PLD or the Perrigo Defendants.  *Id.*, at ¶ 5.  Additionally, "Nestlé S.A. does not have any input into, or control over, the day-to-day operations of Gerber, and Nestlé S.A. did not mandate that Gerber take or refrain from taking any action related to PLD." *Id.*, at ¶ 7.

In its opposition to Nestlé S.A.'s motion, PLD primarily relies on the declaration of Tom Cotter, PLD's "Executive Vice President of Business Development."  Cotter Decl., at ¶ 2.  Cotter states that he was "significantly involved in the negotiation" of the MOU.  *Id.*, at ¶ 4.  He offers two reasons why he believes Nestlé S.A. was involved in the alleged conspiracy.  First, he states that he communicated with various "Gerber/Nestle representatives" regarding the MOU.  *Id.*, at ¶ 5.  Cotter elaborates that these individuals were Jose Luis Cabrera, Alexandre Costa, Ricardo Cancian, and Dominic Strada.  He describes their titles only as follows: Cabrera as "Business Executive Infant Formula," Costa as "SVP Head of Nestle Nutrition Americas," Cancian as "Director, Zone Americas Business Transformation" and Strada as "VP Retail Sales Nestle Nutrition and Health Science." *Id.*, at ¶¶ 6, 8, 14.  Second, Cotter states that some of these individuals made references to the country "Switzerland" and explains that "each time someone wrote in an e-mail to me 'Switzerland,' or mentioned 'Switzerland' to me during a conversation," he understood "Switzerland" to mean "Nestlé S.A." *Id.*, at ¶ 22.  For example, in one email, Cotter states that Cabrera referred to Costa, who was attending a meeting regarding the MOU, as a "key visitor[] from Switzerland." *Id.*, at ¶¶ 6–7.  In another email, Cotter explains

that Cancian attributed Gerber's delay in signing the MOU to the need to receive "the final ok from Switzerland about the MOU." *E.g.*, *id.*, at ¶ 13.

In its reply, Nestlé S.A. attaches three additional declarations.  Kevin Goldberg, Vice President and General Counsel for Nestlé Nutrition North America, reiterates that the "corporate structure" of Nestlé S.A. "is comprised of its parent company Nestlé S.A. and numerous corporate subsidiaries and affiliates located in Switzerland, the United States, and around the world."  Goldberg Decl., at ¶ 4.  He states that, during the relevant period, Strada and Cabrera were both employees of Nestlé Nutrition North America.  They have never been "employees of ultimate parent Nestlé S.A."  *Id.*, at ¶ 6.  Nestlé S.A. also provides the declaration of Costa, who, during the relevant period, was the "Senior Vice President at Nestlé Enterprises S.A. located in Switzerland."  Costa Decl., at ¶ 2.  Costa states that he has never been an employee of Nestlé S.A.  Finally, Nestlé S.A. attaches the declaration of Cancian, who, during the relevant period, was "Senior Director of Business Transformation Americas for Nestlé Regional Globe Office North America."  Cancian Decl., at ¶ 2.  Cancian also states that he has never been an employee of Nestlé S.A.  He further states that, to his knowledge, at "no time was any reference to 'Switzerland' made with an intention to refer" to the ultimate corporate parent Nestlé S.A.  *Id.*, at ¶ 6.  Rather, any reference to "Switzerland" was intended to refer to "Jacqueline Donaldson and Marcela Bliffeld, members of the legal department located in the country of Switzerland" or Costa, who is "located in the country of Switzerland."  *Id.*, at ¶¶ 6–7.  While, as noted, Costa's declaration states that, during the relevant period, he was the "Senior Vice President at Nestlé Enterprises S.A," Goldberg adds that Donaldson and Bliffeld were "General Counsel for Zone Americas at Société des Produits Nestlé S.A." and "Senior Legal Counsel at Société des Produits Nestlé S.A.," respectively.  Goldberg Decl., at ¶ 8.

Having reviewed the parties' submissions, PLD fails to make a *prima facie* showing that Nestlé S.A. — the ultimate parent of hundreds of separate corporate entities within the Nestlé group — participated in the alleged conspiracy.  PLD does not put forward any concrete facts linking Nestlé S.A. to the negotiation, signing, performance, or alleged repudiation of the MOU, or to the Anticompetitive Agreement with the Perrigo Defendants.  Cotter states that he communicated with certain "Gerber/Nestle representatives" regarding the MOU, Cotter Decl., at ¶ 5, but he does not state that any of these individuals worked for or otherwise represented Nestlé S.A., as opposed to another Nestlé S.A. corporate subsidiary or affiliate.  Nestlé S.A.'s declarations, which state that none of the asserted "Gerber/Nestle representatives" identified by Cotter were or have ever been employees of Nestlé S.A., but, instead, were employees of other Nestlé S.A. corporate affiliates or subsidiaries, bolsters this conclusion.

The only other basis that Cotter offers to link Nestlé S.A. to the alleged conspiracy is that he "understood" that references to "'Switzerland' meant Nestlé S.A." *Id.*, at ¶ 22.  However, this appears to simply be conjecture.  Cotter does not offer any facts to support his speculation that references to "Switzerland" meant the ultimate corporate parent Nestlé S.A., as opposed to other corporate subsidiaries, affiliates or individuals located in Switzerland.  Indeed, Cotter's own declaration casts doubt on his understanding.  For example, Cotter states that Cabrera referred to Costa as a "key visitor[] from Switzerland," but Cotter states that Costa worked for "Nestle Nutrition Americas," not Nestlé S.A.  *Id.*, at ¶¶ 6–7.  Mere speculation and conjecture do not suffice to assert conspiracy jurisdiction.  *See Singer v. Bell*, 585 F. Supp. 300, 303 (S.D.N.Y. 1984); *see also Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93–94 (2d Cir. 1975).  Nestlé S.A.'s declarations add support to the conclusion that Cotter's understanding has no factual basis.  Nestlé S.A. is "the ultimate parent of hundreds of separate corporate entities within

the Nestlé group," Geale Decl., at ¶ 6, which are "located in Switzerland, the United States, and around the world."  Goldberg Decl., at ¶ 4.  Without more, the use of the word "Switzerland" could refer to any number of other corporate affiliates, subsidiaries or individuals located in Switzerland.  And Cancian stated that, to his knowledge, use of the word "Switzerland" did not refer to Nestlé S.A., but to Donaldson, Bliffeld, and Costa.

PLD also argues that, if Cotter's declaration does not suffice, the Complaint's allegations make out a *prima facie* showing of personal jurisdiction under N.Y. CPLR 302(a)(2).  For example, PLD highlights its allegation that "throughout lengthy negotiations lasting fifteen months, Gerber repeatedly acknowledged that Nestlé was dictating its actions, that it could not enter into the Contract unless and until Nestlé approved of the Contract, and that it would not sign the Contract until and unless Nestlé directed it to do so."  Complaint ¶ 49.  However, this allegation, and the others that PLD cites, are merely conclusory allegations that Nestlé S.A. was a participant in the conspiracy, which is insufficient to establish jurisdiction.  *Lehigh Valley*, 527 F.2d at 93–94 ("The New York law seems to be clear that the bland assertion of conspiracy or agency is insufficient to establish jurisdiction for the purposes of section 302(a)(2).")

In sum, PLD has not made a *prima facie* showing that CPLR 302(a)(2) provides a statutory basis for the exercise of personal jurisdiction over Nestlé S.A.

### iii.  Rule 4(k)(2) of the Federal Rules of Civil Procedure

Finally, PLD relies on Rule 4(k)(2) as a statutory basis for the exercise of personal jurisdiction over Nestlé S.A., which "allows the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be 'subject to jurisdiction in any state's courts of general jurisdiction'; and (3) the exercise of jurisdiction must be 'consistent with the United States Constitution and

laws.'" *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) (quoting FED. R. CIV. P. 4(k)(2)).   Under the third prong, the exercise of personal jurisdiction over Nestlé S.A. must "comport[] with the Due Process Clause of the Fifth Amendment."   *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003).

Due process under the Fifth Amendment "permits a court to exercise personal jurisdiction over a non-resident where the maintenance of the suit would not 'offend traditional notions of fair play and substantial justice.'"   *Porina*, 521 F.3d at 127 (internal quotation marks omitted) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).   To make this determination, courts must engage in a two-part analysis.   First, courts must ask whether "the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction."   *Id.*   Under Rule 4(k)(2), this step requires an inquiry into the defendant's "contacts with the United States in general, rather than with New York in particular."   *Id.*; *see also Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 330 (2d Cir. 2016) (explaining that the principal difference between due process analysis under the Fifth and Fourteenth Amendments is that "under the Fifth Amendment the court can consider the defendant's contacts throughout the United States.")   If this step is met, courts must "proceed to the second stage of the due process inquiry, and consider whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case."   *Porina*, 521 F.3d at 127 (internal quotation marks omitted).

As to the first step, "[t]he constitutional minimum contacts inquiry distinguishes between general personal jurisdiction and specific personal jurisdiction."   *Lensky v. Turk Hava Yollari, A.O.*, 2023 WL 6173334, at *3 (2d Cir. Sept. 22, 2023).   Plaintiff argues only for the latter, which requires plaintiff to show "that the defendant takes 'some act by which [it] purposefully

avails itself of the privilege of conducting activities within the forum,' and the plaintiff's claims 'arise out of or relate to the defendant's contacts with the forum' – here the United States." *Id.* (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. _, 141 S. Ct. 1017, 1024–25 (2021)). Where the basis for a defendant's minimum contacts with the United States is a conspiracy theory of jurisdiction, a three-prong test must be satisfied. A "plaintiff must plausibly allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that [forum]." *See Schwab*, 22 F.4th at 122 (alterations in original) (internal quotation marks omitted). This "three-prong test *serves* the purposeful availment requirement, rather than supplants it." *Id.* at 125.

As under the New York long-arm statute, PLD contends only that the exercise of personal jurisdiction under Rule 4(k)(2) is appropriate under a conspiracy theory of jurisdiction. To meet this standard, plaintiff relies on the same showing that it argues is sufficient to establish conspiracy-jurisdiction under CPLR 302(a)(2), namely, Cotter's declaration and the Complaint's allegations. As discussed above, that showing was utterly insufficient to make out a *prima facie* case that Nestlé S.A. participated in the alleged conspiracy under CPLR 302(a)(2). This same showing, likewise, does not suffice to make out a *prima facie* case that Nestlé S.A. participated in the alleged conspiracy under the constitutional standard. PLD has not met its burden to show that Nestlé S.A. "purposefully availed" itself of "the privilege of doing business" in the United States.

In sum, PLD fails to meet its burden to show that a statutory basis exists for the exercise of personal jurisdiction over Nestlé S.A. under any of the three asserted statutory bases.

### iv. Jurisdictional Discovery

In the alternative, PLD requests jurisdictional discovery of Nestlé S.A.  District courts retain substantial leeway in deciding whether to grant jurisdictional discovery.  *Herlihy v. Sandals Resorts Int'l, Ltd.*, 795 F. App'x 27, 30 (2d Cir. 2019).  They "frequently permit jurisdictional discovery where the plaintiff has made a 'sufficient start' toward establishing jurisdiction."  *Alexander v. Porter*, 2014 WL 7391683, at *6 (E.D.N.Y. Dec. 29, 2014).  But where the plaintiff offers only "conclusory non-fact-specific jurisdictional allegations," courts do "not permit jurisdictional discovery on the basis of a generalized request more akin to a 'fishing expedition.'"  *Id.*; *see also Lehigh*, 527 F.2d at 93–94.

As discussed above, PLD offers mere conjecture and conclusory non-fact-specific allegations.  Its request for jurisdictional discovery is more akin to a fishing expedition and is denied.

In sum, Nestlé S.A.'s motion to dismiss for lack of personal jurisdiction is granted and PLD's request for jurisdictional discovery is denied.

### b. Rule 12(b)(6) Motions

### i. Standard of Review

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all well-pleaded factual allegations and must draw all reasonable inferences in plaintiff's favor.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010).  While there "is no heightened pleading standard in antitrust cases," *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim

to relief that is plausible on its face." *Id.* Facial plausibility exists when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### ii. Consideration of Material Extraneous to the Complaint

In ruling on a Rule 12(b)(6) motion to dismiss, consideration is limited to "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," as well as any document "where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *DiFolco*, 622 F.3d at 111 (internal quotation marks omitted).

To their motion, the Perrigo Defendants attach a purported "Supply Agreement" between the Perrigo Defendants and Gerber, and request that I consider it. However, according to the Complaint, at issue is an "Anticompetitive Agreement" between the Perrigo Defendants and Gerber. Complaint ¶ 7. Gerber's CEO explained to PLD that the "Anticompetitive Agreement" gave the Perrigo Defendants a "first right" to Gerber's excess supply, which enabled the Perrigo Defendants to block any competitor from accessing Gerber's excess supply and entering the alleged market. *Id.* ¶¶ 8, 67. There is no basis to infer that the "Anticompetitive Agreement" referenced and at issue in the Complaint is a written contract, let alone the specific "Supply Agreement" that the Perrigo Defendants attach to their motion. Accordingly, I will not consider the "Supply Agreement" that the Perrigo Defendants attach to their motion in ruling on the Defendants' 12(b)(6) motions to dismiss.

### iii.  Federal Antitrust Claims

#### 1.  Market Definition

The parties agree that, for PLD's antitrust claims to survive dismissal, plaintiff must plausibly allege a relevant market.  The relevant market is the "area of effective competition within which the defendant operates" and "has two components: a product market and a geographic market." *Concord*, 817 F.3d at 52 (internal quotation marks omitted).  In reviewing an alleged market definition, courts must be mindful that "market definition is a deeply fact-intensive inquiry" and, while not an "absolute rule," "courts hesitate to grant motions to dismiss for failure to plead a relevant" market. *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001).  Here, plaintiff alleges that the relevant product market is the "sale of Store-Brand infant formula to Retailers and the relevant geographic market is the United States."  Complaint ¶ 31.

"A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)).  "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes — analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd*, 275 F.3d at 200 (internal quotation marks and citation omitted).  "'[C]ross-elasticity of demand' between products" "measures 'the extent to which consumers will change their consumption of one product in response to a price change in another.'" *PepsiCo, Inc. v. Coca-Cola Co.* ("*PepsiCo I*"), 1998 WL 547088, at *5 (S.D.N.Y. Aug. 27, 1998) (quoting *Eastman Kodak v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992)).  Courts have found product markets adequately alleged where the plaintiff offers "at least a

- 22 -

'plausible' reason why consumers would not respond to a 'slight increase' in the prices" charged for products in the alleged product market by switching to products outside of it. *Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 576 (S.D.N.Y. 2007); *see also Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 393 (E.D.N.Y. 2004); *PepsiCo I*, 1998 WL 547088, at *12.[4]

Gerber contends that the market definition fails because no party disputes that branded and store-brand infant formula compete at the retail level, and, therefore, branded and store-brand infant formula must belong in the same product market. On this motion to dismiss, Gerber's argument is rejected. Plaintiff does not allege that the relevant product market is the sale of store-brand infant formula at retail locations to end-user consumers, but sales of store-brand infant formula to the retailers themselves, such as Walmart, Sam's Club, Target, Kroger, and CVS. A product market can be limited to a particular category of buyers. *See Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*, 655 F. Supp. 3d 52, 84–86 (D. Conn. 2023); *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 248–49 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002).

With the market limited in this way, plaintiff alleges a plausible reason why retailers would not switch to branded infant formula in response to a slight price increase for store-brand infant formula. According to the Complaint, branded infant formula does not serve the same purposes for retailers as store-brand infant formula. Retailers sell store-brand infant formula to

---

[4] Courts have also explained that the cross-elasticity of supply, "which depends on the extent to which producers of one product would be willing to shift their resources to producing another product in response to an increase in the price of the other product" can be relevant to evaluating a product market definition. *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999). In their briefing, the parties have not focused on the significance, if any, of the cross-elasticity of supply on the market definition. The relevance, "if any, of supply substitutability on market definition can be determined after discovery." *PepsiCo I*, 1998 WL 547088, at *12 n.2.

consumers at significantly discounted prices and make more profit on the sale of store-brand infant formula than they do on branded products. *Cf. Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496–97 (2d Cir. 2004) (concluding that a substantial gap in pricing supported finding a generic drug to be in a separate product market from the brand name alternative). *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832 (2d Cir. 1980), relied upon by Gerber, was a summary judgment decision, decided after the parties engaged in years of discovery, not a motion to dismiss. Importantly, in *Nifty*, the plaintiff did not limit its product market to sales to retailers. Instead, it sought to prove that private label waffles were in a separate consumer product market from brand name waffles. The Second Circuit rejected plaintiff's claim that the two types of waffles were in separate product markets where the evidence showed that "private label and brand name waffles compete directly at the retail level." *Id.* at 840 n.11. Here, by contrast, plaintiff plausibly alleges that store-brand and brand name infant formula do not compete for sales to retailers.[5]

Turning to the geographic market, the "geographic market analysis seeks to identify the precise geographic boundaries of effective competition in order to reach a more informed conclusion on potential harm to the market." *Concord*, 817 F.3d at 52–53. "Courts generally measure a market's geographic scope, the 'area of effective competition,' by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Id.* at 53 (quoting *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d

---

[5] Gerber's characterization of the alleged product market as a single brand product market, which it contends requires dismissal, is rejected. *Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000) is an example of a failed attempt to limit a product market to a single brand. *See Todd*, 275 F.3d at 200 n.3 (citing *Hack* as one such example). In *Hack*, the Second Circuit rejected a product market that consisted only of a Yale College education because Yale competes with many other higher learning institutions. Here, by contrast, PLD's product market is not limited to a single brand of store-brand infant formula; the alleged product market includes any brand of store-brand infant formula sold to U.S. retailers.

219, 227 (2d Cir. 2006)).  "This approach evaluates the geographic aspect of the elasticity of a specified market — that is, how far consumers will go to obtain the product or its substitute in response to a given price increase and how likely it is that a price increase for the product in a particular location will induce outside suppliers to enter that market and increase supply-side competition in that location."  *Heerwagen*, 435 F.3d at 227 (internal quotation marks omitted).  "In other words, [t]he geographic market encompasses the geographic area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition."  *Id*. at 228 (alteration in original) (internal quotation marks omitted).  Courts have found geographic markets to be sufficiently alleged as long as the allegations do not present "glaring deficiencies," such as: (1) failing to plead the "boundaries" of the market; (2) defining the market in "an unreasonably and implausibly narrow manner;" or (3) alleging a "contradictory" or "vague" market.  *Allen v. Dairy Farmers of Am.*, *Inc.*, 748 F. Supp. 2d 323, 338–339 (D. Vt. 2010) (collecting cases).

Gerber contends that the alleged national geographic market fails because PLD ignores that the Perrigo Defendants sell infant formula outside of the country.  It requests that I take judicial notice of a press release that announced sales of the Perrigo Defendants' infant formula to Costco in Canada.  Even assuming that I could take judicial notice of the press release, it would not render the alleged geographic market implausible.  Geographic markets "generally reference both the area in which the seller operates, *and* to which the purchaser can practicably turn for supplies."  *Heerwagen*, 435 F.3d at 230 (internal quotation marks omitted) (concluding the relevant geographic market was local, though defendant sold its product nationally); *see also* Herbert Hovenkamp & Phillip E. Areeda (late), *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ("Areeda & Hovenkamp")  ¶ 550a2 (Fourth & Fifth Editions

2018-2022) (explaining that the area from which a firm draws its customers is not equivalent to a geographic market). Where, as here, plaintiff alleges a national geographic market, it suffices for plaintiff to plausibly allege that customers — here, U.S. retailers — could not turn to areas outside of the United States for supply of the relevant product. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 439 (4th Cir. 2011).

Plaintiff plausibly alleges that U.S. retailers could not turn to manufacturers outside of the United States for store-brand infant formula. According to the Complaint, the manufacture and sale of infant formula in the United States requires FDA approval. The FDA has approved only four such manufacturers in the United States and, according to the Perrigo Defendants' CEO, "it's been 20 years since the FDA approved another." Complaint ¶ 39.

In sum, PLD plausibly alleges a market for the sale of store-brand infant formula to U.S. retailers.

### 2. Section 1 Claim

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy[] in restraint of trade or commerce." 15 U.S.C. § 1. To state a claim under § 1, the plaintiff must allege "(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." *See United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018).

### a. Concerted Action

The first question is "whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 306 (2d Cir. 2023) (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 314–15 (2d Cir.

2015)).  Courts evaluating the adequacy of a complaint's allegations on this score must identify the agreement that is being challenged and the alleged participants.  *Id.* at 308 (explaining that "how the plaintiff frames a challenge affects how we analyze the adequacy of its pleadings"); *see also Anderson News, L.L.C. v. Am. Media, Inc.* ("*Anderson II*"), 899 F.3d 87, 98–99 (2d Cir. 2018) ("[W]hen considering the validity of an antitrust conspiracy claim, we must 'ask precisely, "Who was in agreement with whom and about what?"'" (quoting Areeda & Hovenkamp ¶ 1409)).

Here, the participants to the alleged agreement are the Perrigo Defendants and Gerber and the challenged agreement is their agreement to keep "new entrants," including PLD, "out of the market for the sale of Store-Brand infant formula" to U.S. retailers and preserve "Perrigo's monopoly in that market."  Complaint ¶ 7.

Once the participants and agreement are identified, a court must ask whether the plaintiff has alleged facts that render it plausible that the participants shared a "conscious commitment" to the agreement.  *Relevent Sports*, 61 F.4th at 306; *Anderson News, L.L.C. v. Am. Media, Inc.* ("*Anderson I*"), 680 F.3d 162, 183–84 (2d Cir. 2012); *see also Anderson II*, 899 F.3d at 97. "Those facts can constitute either 'direct evidence that the defendants entered into an agreement' or 'circumstantial facts supporting the <u>inference</u> that a conspiracy existed.'"  *Relevent Sports*, 61 F.4th at 306 (quoting *Apple*, 791 F.3d at 315); *see Anderson I*, 680 F.3d at 183–84.  "Asking for *plausible* grounds to infer an agreement," however, "*does not impose a probability requirement at the pleading stage;* it simply calls for enough fact to raise *a reasonable expectation* that *discovery* will reveal evidence of illegal agreement."  *Anderson I*, 680 F.3d at 184 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Plaintiff raises a plausible inference that Defendants had a "conscious commitment" to such an agreement.  According to the Complaint, Gerber granted the only other manufacturer capable of supplying the store-brand infant formula market — i.e., its only competitor — the ability to prevent Gerber from selling its excess capacity to any distributor.  Gerber allegedly told PLD that Gerber was putting its performance under the MOU "on hold" because of a pre-existing agreement with a third party.  Complaint ¶ 65.  Gerber's CEO Tarun Malkani said to PLD that the agreement was with the Perrigo Defendants and gave the Perrigo Defendants a "'first right' to Gerber's excess capacity."  *Id.* ¶¶ 8, 67.  Such an agreement allowed the Perrigo Defendants "to block any other competitor" from accessing Gerber's excess supply.  *Id.* ¶ 8.  Gerber's General Counsel Kevin Goldberg later confirmed to PLD that an agreement with the Perrigo Defendants prevented Gerber from performing under the MOU.  Plaintiff also alleges a plausible reason why the Perrigo Defendants and Gerber would reach such an agreement.  The Perrigo Defendants sought to ensure that they remained the only suppliers of store-brand infant formula in the market, and Gerber "directly and/or indirectly" reaped a share of the Perrigo Defendants' profits.  Complaint ¶ 61; *see Compass, Inc. v. Real Est. Bd. of New York, Inc.*, 2022 WL 992628, at *9 (S.D.N.Y. Mar. 31, 2022); *Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*, 516 F. Supp. 2d 270, 290 (S.D.N.Y. 2007).

### b.  Unreasonably Restrains Trade

"Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' [the Supreme] Court has long recognized that Congress intended to outlaw only unreasonable restraints."  *Apple*, 791 F.3d at 320 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).  "Thus, to succeed on an antitrust claim, a plaintiff must prove that the common scheme

designed by the conspirators constituted an unreasonable restraint of trade either per se or under the rule of reason." *Id.* at 320–21 (internal quotation marks omitted).

The parties agree, for purposes of this motion, that plaintiff's Section 1 claim should be evaluated under the rule of reason. "The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure . . . to assess the [restraint]'s actual effect on competition." *Ohio*, 138 S. Ct. at 2284 (internal quotation marks omitted). "The goal is to distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* (internal quotation marks omitted).

At the pleading stage, a plaintiff must plausibly allege "that the alleged restraint has an adverse effect on competition in either one of two ways." *Compass*, 2022 WL 992628, at *4. "First, the plaintiff can demonstrate the adverse effect directly by showing that the unlawful agreement has 'an *actual* adverse effect on competition as a whole in the relevant market.'" *Id.* (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995)). "Actual adverse effects on competition can include 'reduced output, decreased quality, and supracompetitive pricing.'" *Id.* (quoting *Am. Express*, 838 F.3d at 194). "Alternatively, a plaintiff can satisfy the initial burden by demonstrating adverse effects indirectly." *Id.* "To do so, the plaintiff must demonstrate 'both the defendant's market power and "other grounds" for believing the challenged restraint harms competition.'" *Id.* (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018)).

Plaintiff has done so, at least as to the indirect method of showing anticompetitive effect. As discussed in Section iii.3.a, *infra*, plaintiff sufficiently alleges that the Perrigo Defendants possess monopoly power in the store-brand infant formula market. Because "[m]onopoly power

under § 2 requires, of course, something greater than market power under § 1," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992), the allegations that the Perrigo Defendants have monopoly power in the relevant market suffice to plead Defendants' market power for purposes of Section 1. *See Geneva*, 386 F.3d at 509 (finding monopoly power also satisfied proof of market power under Section 1).

Market power alone is not enough; plaintiff must also plausibly allege "'other grounds' for believing the challenged restraint harms competition." *N. Am. Soccer League*, 883 F.3d at 42 (quoting *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183–84 (2d Cir. 2016)). Plaintiff plausibly alleges such grounds, including significantly heightened barriers to entry, such as high costs to construct an infant formula manufacturing plant and the need for FDA approval, and reduced consumer choice. PLD alleges that the Perrigo Defendants' CEO explained that "it's been 20 years since the FDA approved another" infant formula manufacturer in the United States. Complaint ¶ 39. Of existing infant formula manufacturers, only the Perrigo Defendants and Gerber have the capacity to sell store-brand infant formula. PLD sufficiently alleges that, in light of the high barriers to becoming an infant formula manufacturer, the Perrigo Defendants' and Gerber's challenged agreement imposed significantly heightened barriers to enter the market for the sale of store-brand infant formula to U.S. retailers. The Anticompetitive Agreement prevented distributors, like PLD, from obtaining any supply of store-brand infant formula and competing with the Perrigo Defendants for sales to U.S. retailers. As to reduced consumer choice, because of the Perrigo Defendants' and Gerber's alleged Anticompetitive Agreement, U.S. retailers were limited to purchasing store-brand infant formula from the Perrigo Defendants. According to the Complaint, U.S. retailers lost the opportunity to purchase store-brand infant formula from distributors, like PLD, that could sell Gerber's excess supply.

Gerber's reliance on *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23 (2d Cir. 2006), is misplaced.  There, the Second Circuit held that a former distributor failed to allege that an exclusive distributorship agreement between a manufacturer of green hem-fir lumber and a rival distributor harmed competition.  The manufacturer had a 95% market share in the green hem-fir lumber market.  Therefore, the agreement provided no "monopolistic benefit to [the manufacturer] that it does not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined," and the manufacturer established, for example, its own in-house distribution system.  *Id.* at 29.  In contrast to *E & L Consulting*, the alleged Anticompetitive Agreement has enabled the Perrigo Defendants to maintain their monopoly by blocking distributors, like PLD, from selling Gerber-manufactured store-brand infant formula.  Had the Anticompetitive Agreement not existed, the Perrigo Defendants' monopoly would have been challenged.

### 3.   Section 2 Monopolization Claim

Under Section 2, it is illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several states."  15 U.S.C. § 2.  This claim has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co.*, 11 F.4th 118, 137 (2d Cir. 2021) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  The Perrigo Defendants argue that PLD has not plausibly alleged a monopolization claim against it.

### a. Monopoly power

"Monopoly power is 'the power to control prices or exclude competition.'" *Geneva*, 386 F.3d at 500 (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). "It can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Id*. Plaintiff alleges that the Perrigo Defendants have a 100% share of the market for the sale of store-brand infant formula to U.S. retailers. At the motion to dismiss stage, an allegation of such a high market share, even without consideration of other market characteristics, suffices to raise an inference of monopoly power. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 227 (S.D.N.Y. 2019); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 385–86 (S.D.N.Y. 2007).

### b. Anticompetitive Conduct

At the pleading stage, plaintiff must also plausibly allege that the defendant engaged in anticompetitive or exclusionary conduct. *United Food*, 11 F.4th at 137; *see also Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.") The Second Circuit has described the element of anticompetitive conduct in different ways, including "improper conduct that has or is likely to have the effect of controlling prices or excluding competition," *United Food*, 11 F.4th at 137, or "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014).

"At a minimum, a monopolist" engages in anticompetitive or exclusionary conduct if it "'has acquired or maintained . . . [its] monopoly . . . by means of those restraints of trade which

are cognizable under §1 [of the Sherman Act].'"  Areeda & Hovenkamp ¶ 651i (quoting *United States v. Griffith*, 334 U.S. 100, 106 (1948)); *see Meredith Corp. v. SESAC, LLC*, 2011 WL 856266, at *15 (S.D.N.Y. Mar. 9, 2011) (denying motion to dismiss and explaining that plausible allegations that defendants violated Section 1 sufficed to plead anticompetitive conduct for Section 2).  Here, PLD alleges that the Perrigo Defendants maintained their monopoly in the market for the sale of store-brand infant formula to U.S. retailers by entering into the Anticompetitive Agreement with Gerber.  Such allegations, which, as discussed above, are sufficient to plead a Section 1 claim are also sufficient to allege that the Perrigo Defendants engaged in anticompetitive or exclusionary conduct for purposes of PLD's Section 2 monopolization claim.

In arguing in favor of dismissal, the Perrigo Defendants contend that PLD's claim fails because PLD has not alleged a claim of predatory buying, unilateral refusal to deal, or denial of access to an essential facility.  These arguments are without merit.  PLD's monopolization claim is not premised on unilateral conduct but on concerted action between the Perrigo Defendants and Gerber, and PLD expressly disclaims any reliance on these theories of unilateral conduct in its opposition.

### 4.  Section 2 Conspiracy to Monopolize Claim

The "essence" of a conspiracy to monopolize claim is "an agreement entered into with the specific intent of achieving monopoly."  *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 85 (2d Cir. 1981).  Such a claim requires plausible allegations "of (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize."  *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988).  Gerber alone challenges only the third element of this claim.  PLD responds that it has sufficiently alleged that Gerber entered

into the Anticompetitive Agreement with the Perrigo Defendants with the specific intent to maintain the Perrigo Defendants' monopoly in the market for the sale of store-brand infant formula to U.S. retailers.  Specific intent to monopolize can be inferred from a defendant's anticompetitive conduct.  *Volvo*, 857 F.2d at 74; *Ne. Tel. Co.*, 651 F.2d at 85.  Here, Gerber's allegedly Anticompetitive Agreement with the Perrigo Defendants enabled the Perrigo Defendants to block any other distributor, including PLD, from entering the alleged market.  As PLD argues, such conduct raises a plausible inference that Gerber had the requisite specific intent to monopolize.

### 5. Antitrust Standing

"While the Clayton Act's Sections 4 (damages) and 16 (injunctive relief), 15 U.S.C. §§ 15 and 26, permit private citizens to sue under the federal antitrust laws, private plaintiffs must demonstrate antitrust standing."  *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 nn. 5–6, (1986)).  "The antitrust standing requirement reflects the judgment that 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'"  *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019) (quoting *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983)).  "To satisfy antitrust standing at the pleading stage a plaintiff must plausibly allege two things: (1) that it suffered a special kind of antitrust injury, and (2) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws."  *Id.* (internal quotation marks omitted).  Gerber challenges the first requirement, arguing that PLD has not plausibly alleged that it suffered antitrust injury.

As to that requirement, a "plaintiff raising an antitrust claim must demonstrate antitrust injury to ensure[] that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Id.* The Second Circuit's "jurisprudence culminating in [*Gatt Communications, Inc. v. PMC Associates., L.L.C.*, 711 F.3d 68 (2d Cir. 2013)] established a three-part test for determining whether the plaintiff has alleged an antitrust injury." *IQ Dental*, 924 F.3d at 62. The three-part test is as follows: "(1) the court must identify[] the practice complained of and the reasons such a practice is or might be anticompetitive; (2) the court must identify the actual injury the plaintiff alleges . . . [which] requires [it] to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct; and (3) the court compares the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Id.* at 62–63 (internal quotation marks and citations omitted).

When considering whether a plaintiff has sufficiently alleged antitrust injury, "[i]t is not enough for the actual injury to be 'causally linked' to the asserted violation." *Gatt*, 711 F.3d at 76 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 486 (1977)). The antitrust laws "are not concerned with injuries to *competitors*" as such. *Id.* at 77. For example, in *Gatt*, plaintiff alleged that it lost revenue when it was terminated from a bid-rigging scheme. However, the only way in which the bid-rigging scheme was unlawful under the antitrust laws was because it may have caused increased prices to consumers. The plaintiff's lost revenue as a result of its termination from the bid-rigging scheme simply did not "flow[] from that which makes bid-rigging unlawful" because plaintiff never alleged that it was forced to pay higher prices for a product. *Id.*

Here, as discussed above, PLD alleges that the Perrigo Defendants' and Gerber's agreement was unlawful because it heightened barriers to enter the market for the sale of store-brand infant formula to U.S. retailers and reduced U.S. retailers' choices.  PLD alleges that its injury, i.e., its exclusion from the market, resulted from the Perrigo Defendants' and Gerber's Anticompetitive Agreement.  A competitor that is excluded from the market because of an agreement that is alleged to be an illegal restraint of trade is a "conventional form of antitrust injury because it is exactly the type [of injury] that antitrust laws were designed to prevent and flows from the competition-reducing aspect of [defendant's] conduct."  *See, e.g.*, *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *11–12 (S.D.N.Y. Feb. 21, 2019) (internal quotation marks omitted) (holding that a reasonable jury could find that the plaintiff suffered antitrust injury because of its exclusion from the market resulting from defendant's unlawful "contracting practices," especially since the agreement left only a single competitor in the market).

Accordingly, PLD sufficiently alleges that it suffered antitrust injury.

### iv.  State Law Antitrust Claims

Plaintiff brings analogous New York State antitrust claims under the Donnelly Act against the Perrigo Defendants and Gerber.  The New York Court of Appeals has explained that the Donnelly Act, which was modeled on the Sherman Act, "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result."  *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994).  Defendants cite "no relevant state policies or statutory distinctions between the Sherman and Donnelly Acts that should lead" to a different result.  Thus, the state antitrust claims also survive against Gerber and the Perrigo

Defendants.  *O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 594
(E.D.N.Y. 2020).

### v.  State Law Contract Claims

#### 1.  Breach of Contract

Under New York law, which the parties agree governs the MOU, to state a claim of
breach of contract, "the complaint must allege: (i) the formation of a contract between the
parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."
*Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011).  Both PLD and Gerber
agree that, by entering into the MOU, the parties formed a contract.  However, they disagree as
to the obligations that the MOU imposed on them.  According to Gerber, as expressed in the
language of the MOU, the MOU merely imposed on the parties an obligation to "use
commercially reasonable efforts" to negotiate a "more detailed, binding" Supply Agreement.
MOU 1, 5.  Gerber argues that PLD does not allege that Gerber breached such an obligation and,
therefore, the breach of contract claim should fail.  PLD responds that the MOU imposed
additional obligations on Gerber beyond the more limited obligation to "use commercially
reasonable efforts" to negotiate a "more detailed, binding" Supply Agreement.  *Id.* 5.  Plaintiff
contends that the MOU contemplates that a later Supply Agreement "may never be executed and,
if so, that the terms of the MOU and PLD's standard Purchase Order will control for the life of
the MOU."  PLD's Opp'n 41.

At the motion to dismiss stage, a court must determine whether a contract is
unambiguous as to the issue disputed by the parties.  A "district court may dismiss a breach of
contract claim only if the terms of the contract are unambiguous."  *Edwards v. Sequoia Fund,
Inc.*, 938 F.3d 8, 13 (2d Cir. 2019).  "A contract is unambiguous where the contract language has

- 37 -

a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (internal quotation marks omitted).  By contrast, "if a contract is ambiguous as applied to [the facts that furnish the basis of the suit], a court has insufficient data to dismiss a complaint for failure to state a claim."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 295 (2d Cir. 2015) (alteration in original).

*Live Brands Holdings, LLC v. Gastronomico Gracias a Dios, Sociedad Responsabilidad Limitada de Cap. Variable*, 2023 WL 1765915 (S.D.N.Y. Feb. 3, 2023), is instructive.  There, the court denied a motion to dismiss the plaintiff's breach of contract claim when it found an MOU to be ambiguous as to the obligations it imposed on the parties before the parties executed "Definitive Agreements," which the MOU stated would incorporate the MOU's terms.  *Id.* at *5–6.  Similarly, in *Cox v. Spirit Airlines, Inc.*, 786 F. App'x 283 (2d Cir. 2019), the Second Circuit reversed the district court's grant of a motion to dismiss a breach of contract claim because it was ambiguous whether a term within the contract imposed an obligation on the defendant.

It is unnecessary at this stage of the proceedings to decide between PLD's or Gerber's reading of the MOU.  Rather, having carefully reviewed the MOU, it is enough to determine that the MOU is ambiguous as to the obligations it imposed on the parties prior to the execution of a "more detailed, binding" Supply Agreement.  MOU 1.  The MOU can reasonably be read to impose additional obligations on Gerber, and PLD, beyond the more limited obligation to "use commercially reasonable efforts" to negotiate prior to the execution of the "more detailed, binding" Supply Agreement.  *Id.* 1, 5.

Indeed, one reasonable reading of the MOU is that it imposed obligations on the parties relating to the purchases of Gerber's product prior to the execution of a "more detailed" Supply

Agreement.  *Id*. 1.  The MOU contains a price term, which the MOU states "is valid for a period of one year from the date of this MOU" (not, for example, from the date of the execution of the Supply Agreement).  *Id.* 3.  The MOU further provides that "the parties agree that the terms of this MOU shall govern the Parties' performance until such time as the Supply Agreement is fully executed" and "[u]ntil execution of a Definitive Agreement by both parties, all purchases and sales will be pursuant to PLD's standard Purchase Order terms and conditions, a copy of which has been provided to Gerber."  *Id.* 4–5.  It also states that the "Parties agree that while the Term of the Supply Agreement is contemplated as set forth below, the Parties will begin certain activities related to the performance of the Supply Agreement in preparation of the Parties intended obligations, and as set forth herein."  *Id.* 4.

The "Term/Termination" provisions further support such a reading.  The MOU states that "[e]ither Party shall have the right to terminate this MOU *and*, *if executed*, the Supply Agreement, if PLD's purchases of such Product (calculated in accordance with GAAP) for the calendar year 2023 and any calendar year thereafter are less than $5,000,000."  *Id.* 4 (emphasis added).  It further provides that "[u]pon receipt of any such notice of termination, Gerber shall immediately cease work on any Purchase Orders submitted by PLD, and PLD shall pay Gerber for any completed shipments of Product received by PLD prior to the effective date of termination."  *Id.*  The MOU also states that "Gerber shall have the right, upon thirty (30) days written notice, to terminate this MOU if, Gerber as part of its ordinary business, decides to exit the infant formula business or divests its infant formula business or alternatively elects to cease manufacturing infant formula."  *Id.*  A reasonable reading of these terms is that the MOU imposed obligations on the parties relating to the purchases of Gerber's product even before a "more detailed" Supply Agreement was executed.  *Id.* 1.

In arguing that the MOU unambiguously bound the parties only to a more limited obligation to "use commercially reasonable efforts" to negotiate a Supply Agreement, Gerber primarily relies on two provisions in the MOU.  Gerber points to the MOU's language that it was "intended to create a summary of terms that will be included in a more detailed, binding definitive supply agreement" and that the "parties shall use commercially reasonable efforts to negotiate a Supply Agreement incorporating substantially the terms set forth above by June 1, 2021."  *Id.* 1, 5.  However, neither of these provisions renders Gerber's reading of the MOU the only reasonable interpretation, considering the other provisions in the MOU discussed above.  In *White Winston Select Asset Funds, LLC v. Intercloud Systems, Inc.*, 619 F. App'x 157 (3d Cir. 2015), for example, the Third Circuit, applying New York law, reversed the district court's grant of a motion to dismiss a breach of contract claim, holding that a Term Sheet that purported to "'summarize[]' the terms for and provide 'the basis for continued discussions'" could, nonetheless, plausibly be read to impose additional obligations on the defendant.  *Id.* at 161.  In sum, a contract may be read to impose additional obligations on the parties even when it contemplates the negotiation of a later agreement.  *See also Live Brands*, 2023 WL 1765915, at *5–6; *Bed Bath & Beyond Inc. v. IBEX Const., LLC*, 52 A.D.3d 413, 414 (1st Dept 2008); *Lo Cascio v. James V. Aquavella, M.D., P.C.*, 206 A.D.2d 96 (4th Dept 1994).[6]

---

[6] In its briefing, Gerber relies on certain factors that federal courts have used to assess whether preliminary agreements are "Type I" or "Type II" contracts.  The federal courts' "Type I/Type II" formulation has not been received with favor by the New York Court of Appeals.  *See IDT Corp. v. Tyco Grp.*, 13 N.Y.3d 209, 213 n.2 (2009) ("While we do not disagree with the reasoning in federal cases, we do not find the rigid classifications into 'Types' useful . . . it is enough to ask in this case whether the agreement contemplated the negotiation of later agreements and if the consummation of those agreements was a precondition to a party's performance."); *White Winston*, 619 F. App'x at 161 (explaining that the New York Court of Appeals' rejected the "Type I-Type II taxonomy" and declining to follow it); *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 427 (1st Dept 2010) (same); *but see Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 150–51 (2d Cir. 2022) (continuing to apply the Type

Gerber's motion to dismiss the breach of contract claim is denied.

### 2.  Tortious Interference with Contract

Under New York law, to state a claim for tortious interference with contract, a plaintiff must allege: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages." *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006) (quoting *Foster v. Churchill*, 87 N.Y.2d 744, 750–751 (1996)).  "Moreover, 'a plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct.'" *Rich v. Fox News Network, LLC*, 939 F.3d 112, 127 (2d Cir. 2019) (quoting *Burrowes v. Combs*, 25 A.D.3d 370, 373 (1st Dep't 2006)).  In response to a tortious interference with contract claim, "a defendant may raise the economic interest defense." *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007).  At the pleading stage, as an affirmative defense, the facts establishing the defense must be apparent from the face of the complaint. *See N. Shore Window & Door, Inc. v. Andersen Corp.*, 2021 WL 4205196, at *11 (E.D.N.Y. Aug. 3, 2021).  If the economic interest defense is so apparent, a plaintiff can still overcome the defense by alleging that the defendant acted "maliciously, fraudulently, or illegally." *Green Star Energy Sols., LLC v. Edison Props., LLC*, 2022 WL 16540835, at *15 (S.D.N.Y. Oct. 28, 2022).

The Perrigo Defendants contest only the third element of PLD's tortious interference claim; they argue that PLD does not allege that the Perrigo Defendants "intentionally procured a

---

I/Type II framework).  In any event, it is unnecessary at this stage to consider whether the "Type I" and "Type II" framework should be applied and whether the MOU falls under one or the other, which can be revisited at a later stage of the litigation.  For the reasons discussed above, the MOU is not unambiguously a "Type II" contract, which creates an obligation on the parties only "to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework," as described in *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005).  However, neither can it be unambiguously read to be a Type I contract, which "binds both sides to their ultimate contractual objective." *Id.*

breach" of the MOU.  They also argue that the economic interest defense warrants dismissal of this claim.  Both arguments fail.  As discussed above, PLD plausibly alleges that the Perrigo Defendants invoked their "'first right' of refusal" under their Anticompetitive Agreement with Gerber, intending that it would cause Gerber to breach its MOU with PLD.  This allegation suffices to plead that the Perrigo Defendants intentionally procured a breach of the MOU.  *See Keurig*, 383 F. Supp. 3d at 253.

As for the economic interest defense, in *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422 (2007), the New York Court of Appeals explained that the defense provides a justification for the defendant's procuring the breach of a contract when it was acting "to protect its own legal or financial stake in the breaching party's business."  *Id.* at 426.  *White Plains* described several categories of cases where the defense has been applied: "[W]here defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff."  *Id.*  For example, in *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682 (1969), the New York Court of Appeals permitted Chock Full O'Nuts, as the sole stockholder of Sol Cafe, to invoke the defense to defend against a claim that it tortiously interfered with plaintiff's contract of employment with Sol Cafe.  As the "sole stockholder of Sol Cafe, [Chock Full O'Nuts] had an existing economic interest in the affairs of Sol Cafe which it was privileged to attempt to protect."  *Id.* at 687.  *White Plains* contrasted the case before it, which involved a "defendant who is simply plaintiff's competitor and knowingly solicits" plaintiff's existing customers, causing them to breach their contracts with plaintiff.  8 N.Y.3d at 426.  The defense did not apply because "mere status as plaintiff's competitor is not a

legal or financial stake in the breaching party's business that permits defendant's inducement of a breach of contract." *Id.*

Here, it is not apparent from the face of the complaint that the Perrigo Defendants held a "legal or financial stake" in Gerber's business. The Perrigo Defendants appear to argue that the purported "Supply Agreement," which they attach to their motion, qualifies as such a stake. However, for the reasons already discussed, *supra* Section III.b.ii, the "Supply Agreement" is not properly considered on a Rule 12(b)(6) motion to dismiss. Rather, PLD alleges in the Complaint that the Perrigo Defendants entered into an Anticompetitive Agreement with Gerber. That allegedly unlawful agreement is surely not akin to the types of "legal or financial stake[s]" that *White Plains* explained justify invocation of the economic interest defense. *See White Plains*, 8 N.Y.3d at 426. In any event, even if it were apparent from the face of the complaint that the Perrigo Defendants held such a stake in Gerber's business, PLD plausibly overcomes the defense by alleging that the Perrigo Defendants procured the breach through illegal means.[7]

In sum, the Perrigo Defendants' arguments do not warrant dismissal of PLD's tortious interference with contract claim.

---

[7] The Perrigo Defendants rely on *Midwest Railcar Corp. v. Everest Railcar Services, Inc.*, 2017 WL 1383765 (S.D.N.Y. Apr. 13, 2017), for the proposition that a tortious interference with contract claim "cannot rest on conduct that is incidental to some other lawful purpose" and that the valid exercise of a contractual right is such a lawful purpose. *Id.* at *8. However, I agree with PLD that it does not allege that the Perrigo Defendants acted pursuant to a lawful contractual right, but rather pursuant to its Anticompetitive Agreement with Gerber.

**IV.    Conclusion**

For the reasons discussed above, Nestlé S.A.'s motion to dismiss for lack of personal jurisdiction is granted, and Defendants' motions to dismiss for failure to state a claim are denied.

**SO ORDERED.**

_____
     **/S/**
**NINA GERSHON**
**United States District Judge**

February 6, 2024
Brooklyn, New York